William L. Ghiorso, OSB No. 902706
Ghiorso Law Office
494 State Street, Suite 300
Salem, Oregon 97301
Telephone: (503) 362-8966
Bill@ghiorsolawoffice.com
Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| MELVIN RAY NEAGLE,<br><br>                    Plaintiff,<br><br>v.<br><br>THE GOLDMAN SACHS GROUP, INC, a Delaware Corporation d/b/a MTGLQ INVESTORS, L.P., a Delaware Limited Partnership; OCWEN FINANCIAL CORP., a Florida Corporation; OCWEN MORTGAGE SERVICING, INC., a U.S. Virgin Islands Corporation; OCWEN LOAN SERVICING, LLC, a Delaware Limited Liability Company; ALTISOURCE SOLUTIONS, INC., a Delaware Corporation.<br><br>                    Defendants. | **Case No.** 6:18-cv-00754<br><br><br><br>**COMPLAINT**<br><br>PUNITIVE DAMAGES REQUESTED<br><br>JURY TRIAL DEMANDED<br><br>NOT SUBJECT TO MANDATORY ARBITRATION |

# INTRODUCTION

**1.**     This action arises out of a foreclosure proceeding in the Linn County Circuit Court for the State of Oregon, Case No. 120991, in which Defendants Ocwen Loan Servicing, LLC, Ocwen Mortgage Servicing, Inc., and Ocwen Financial Corporation (collectively, "Ocwen"), wrongfully reactivated the foreclosure proceeding against Plaintiff in violation of an automatic bankruptcy stay, and pursuant to that order reactivating the case, successfully directed the Linn County Sheriff to sell Plaintiff's property so that Ocwen and its coconspirators could benefit, either directly or indirectly, from the inflated loan balance and mortgage insurance recovered from the foreclosure. This injury occurred after Ocwen spent years unlawfully charging marked-up fees and costs to Plaintiff in order to keep Plaintiff from recovering from his default status. Ocwen's wrongful foreclosure and excessive charges to Plaintiff's account were the direct and proximate result of Ocwen's nationwide practice, policy, and custom of using fees and costs, especially those passed on to a borrower from a third-party, to wrongfully inflate the balance owed by the borrower, resulting in Ocwen wrongfully profiting from the borrower's perpetual delinquency and inability to catch up with a rapidly increasing unpaid balance.

**2.**     Ocwen, together with numerous other affiliated entities operating in the subprime mortgage loan servicing market, including Altisource Solutions, Inc. ("Altisource"), conspired to, among other things, inflate fees and costs charged to borrowers by marking up expenses such as third-party services and mortgage insurance premiums. When borrowers fell behind on payments and went into default, Ocwen would obtain a number of default related services through Altisource, who then orders the services using a network of third-party vendors. Altisource and other co-conspirators enlisted by Ocwen would mark up the actual cost of these

1  third-party services and pass the marked-up charge along to Ocwen, who in turn would pass the

2  marked up charge to the borrower without disclosing the price increase.

3  **3.**    In addition to the above-described conspiracy, Ocwen has also shown a nationwide

4  policy, practice, and/or custom of misapplying homeowners' payments in a manner that

5  maximizes fee income to Ocwen as a non-bank mortgage loan servicer. This regular abuse by

6  loan servicers like Ocwen has led to numerous consent orders, but according to an Interagency

7  Review of Foreclosure Policies and Practices:

8  "Examiners may not have uncovered cases of misapplied payments or
9  unreasonable fees, inappropriate force-placing of insurance, failure to consider
10  adequately a borrower for a modification, or requiring a borrower to be delinquent
11  to qualify for a loan modification." [1]

12  **4.**    Ocwen's loan servicing and asset management practices are designed to avoid detection,

13  even when examined in bankruptcy proceedings. As one court has explained: "[l]enders have

14  apparently been operating under the assumption that the fees and costs in their proofs of claim

15  are invulnerable to challenge because debtors lack the sophistication, the debtors' bar lacks the

16  financial motivation, and bankruptcy courts lack the time . . . [T]he Court believes that certain

17  members of the mortgage industry are *intentionally* attempting to game the system by requesting

18  undocumented and potentially excessive fees." [2] This pattern of abuse has led to thousands of

19  borrowers nationwide struggling to pay artificially inflated mortgages as a direct result of

20  Ocwen's rapid growth following the housing market crash. The structure of Ocwen's businesses

21  and management of borrowers' fees incentivizes Ocwen to prematurely foreclose on properties

[1] Fed. Reserve Sys., Interagency Review of Foreclosure Policies and Practices 2 (Fed. Reserve
Sys. Apr. 2011),
https://www.federalreserve.gov/BoardDocs/RptCongress/interagency_review_foreclosures_2011
0413.pdf.
[2] *In re: Prevo*, 394 B.R. 847, 848, 851 (Bankr. S.D. Tex. 2008) (emphasis added).

1  to profit off of a borrower's financial distress. Through its actions, Ocwen is able to guarantee

2  inflated profits to affiliated businesses which enables it to effectively exclude competitors from

3  the non-bank servicing market, leaving a substantial majority of borrowers in massive amounts

4  of debt from a lack of competition which would otherwise drive Ocwen's profits down.

5  **5.**    Plaintiff brings this action pursuant to section four of the Clayton Act, which provides:

6  "any person who shall be injured in his business or property by reason of anything forbidden in

7  the antitrust laws may sue … and shall recover threefold the damages by him sustained." 15

8  U.S.C.A. § 15(a). As detailed below, Plaintiff, like thousands of other borrowers across the

9  nation, suffered harm to his career, reputation, and finances as a direct and proximate result of

10  Ocwen's anticompetitive conduct in the non-bank loan servicing industry.

11  <center>**JURISDICTION**</center>

12  **6.**    Jurisdiction of this court arises under 28 U.S.C. § 1331; 28 U.S.C. § 1332; 15 U.S.C.A. §

13  15(a); 28 U.S.C. § 1337; and 42 U.S.C.A. § 1988(a).

14  <center>**VENUE**</center>

15  **7.**    Venue is proper in this district under 28 U.S.C. §1391(b) in that the Defendants transact

16  business here and the conduct complained of occurred, among other places, in this district.

17  <center>**PARTIES**</center>

18  **8.**    Plaintiff Melvin Ray Neagle is a natural person residing in Linn County, Oregon.

19  Plaintiff works as an auctioneer, and also purchases homes himself to either resell, refurbish,

20  and/or use as rental properties. Plaintiff attends publicly held auctions to purchase foreclosed

21  homes, and invests in the properties, rents them, or resells them for a higher value at a later date.

22  Plaintiff's career is founded upon his reputation for working with tenants, rehabilitating

properties, and operating a cordial and stress-free business. Plaintiff is also a "consumer" as that term is defined by 15 U.S.C. §1692a(3).

**9.**    Defendant Ocwen Loan Servicing, LLC is a a Delaware Limited Liability Company organized and existing under the laws of the State of Florida and is a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6). Defendant Ocwen Loan Servicing, LLC is a wholly owned subsidiary of Ocwen Mortgage Servicing, Inc., which is a wholly owned subsidiary of Ocwen Financial Corporation. Ocwen engages in nonbank loan servicing, real-estate investing, rehabilitation, and resale, and general mortgage foreclosure and liquidation as its business. As a loan servicer, Ocwen agrees to service a loan under a pooling and servicing agreement, in return for consideration such as the unpaid balance of a mortgage loan, late fees, float charges, or other ancillary fees. Founded in 1988 by William C. Erbey, Ocwen quickly became the largest non-bank mortgage servicer in the United States, and the fourth-largest servicer of mortgages generally. Together with its affiliated companies who shared the same Chariman, William C. Erbey, Ocwen was the central operation in a network of Erbey-dominated companies involved in the loan origination, servicing, and foreclosure business. Ocwen is licensed to service mortgage loans in all fifty states, including Oregon, the District of Columbia, and two U.S. territories.

**10.**    Defendant Altisource Solutions, Inc., is a Delaware corporation with its principal office location in Atlanta, Georgia. In August of 2009, Altisource was spun off as a separate company from Ocwen, and is now the exclusive entity that provides Ocwen with third-party services relating to Ocwen's practices in the nonbank subprime mortgage loan servicing market.

**11.**    MTGLQ Investors, L.P. ("MTGLQ") is a Delaware limited partnership, whose general partner is MLQ, L.L.C., which holds a 1% interest in MTGLQ, and whose limited partner is The Goldman Sachs Group, Inc., which holds a 99% interest in MTGLQ. MLQ, L.L.C. is a limited

liability company, whose members are Goldman Sachs Global Holdings L.L.C. and The

Goldman Sachs Group, Inc. Goldman Sachs Global Holdings L.L.C. is a limited liability

company whose members are The Goldman Sachs & Co. L.L.C. and The Goldman Sachs Group,

Inc. The Goldman Sachs & Co. L.L.C. is a limited liability company whose member is The

Goldman Sachs Group, Inc. The Goldman Sachs Group, Inc. is a publicly traded entity which, as

indicated, owns more than a 10% interest in MTGLQ.

**12.**     The Goldman Sachs Group, Inc. is a corporation organized under the laws of the State of

Delaware, and at all times material hereto was doing business as MTGLQ Investors, L.P. and is

liable for all actions taken by MTGLQ Investors, L.P. through the course and scope of its agency

relationship with MTGLQ Investors, L.P.

**13.**     In this Complaint, whenever reference is made to any act, deed, or conduct of any one of

the above-mentioned Defendants, committed in connection with the combination and conspiracy

alleged herein, the allegation means the Defendants collectively, or the Defendant or Defendants

that are the subject of the relevant allegation collectively, and that each Defendant engaged in the

act, deed, or conduct by or through one or more of their officers, directors, agents, employees,

coconspirators, or representatives, each of whom was actively engaged in the management,

direction, control, or transaction of the ordinary business and affairs of Defendants individually

and collectively, and the combination and conspiracy itself.

## FACTUAL BACKGROUND

**A.     Ocwen rapidly became the nation's largest non-bank servicer of subprime mortgage loans.**

**14.**     As a non-bank mortgage loan servicer, Ocwen is responsible for the collection and

remittance of principal and interest payments, the administration of escrow accounts, the

collection of insurance claims, and the management of loans that are delinquent or in foreclosure. At all times material hereto, Ocwen specialized in servicing "subprime," or high-risk mortgages, which Ocwen began to acquire in significant numbers following the housing market crash, when servicing loans ceased to be a profitable industry for larger banks.

15.    Traditionally, banks would loan money to borrowers who agreed to repay the banks with interest over time. The banks would service the borrower's mortgage by processing payments and sending out applicable notices and other information until the loan was repaid. As a result, banks had a financial interest in ensuring that the homeowner was able to repay the mortgage loan.

16.    That process has significantly changed today. Mortgages are now bundled and sold through mortgage backed securities to investors on Wall Street, a process called "securitization." Through this process, originating lenders are immediately reimbursed for the amount loaned to borrowers, which eliminates the financial risk from the borrower's default. The loans are then serviced by a loan servicer, rather than the originating bank. This change resulted in the originating bank's interest becoming disassociated from the homeowner's interest.

17.    Ocwen, as a loan servicer, profits from fees and costs charged to the homeowner in an amount commensurate with the unpaid principal balance ("UPB") of the mortgage loan. Additionally, under a pooling and servicing agreement ("PSA") with investors and noteholders, Ocwen and other loan servicers assess fees on borrowers' accounts for default-related services. Those fees and costs include, among other things, broker's price opinion ("BPO") fees, appraisal fees, title search fees, technology fees, lender-placed insurance fees and costs, and escrow fees.

18.    Rather than profiting from the interest on the loan, as an originating bank normally would, Ocwen's primary concern as a loan servicer is to generate as much revenue as possible

from fees and costs assessed against the mortgage accounts it services. Like other loan servicers, Ocwen's business model encourages it to "cut costs wherever possible, even if [that] involves cutting corners on legal requirements, and to lard on junk fees and insources expenses at inflated prices." [3] As explained by one Member of the Board of Governors of the Federal Reserve System:

> "While an investor's financial interests are tied more or less directly to the performance of a loan, the interests of a third-party servicer are tied to it only indirectly, at best. The servicer makes money, to oversimplify it a bit, by maximizing fees earned and minimizing expenses while performing the actions spelled out in its contract with the investor . . . . The broad grant of delegated authority that servicers enjoy under pooling and servicing agreements (PSAs), combined with an effective lack of choice on the part of consumers, creates an environment ripe for abuse." [4]

**19.**    By the time Ocwen acquired the mortgage servicing rights ("MSRs") to Plaintiff's mortgage in 2013, Ocwen had become the largest non-bank mortgage loan servicer in the United States, collecting payments on nearly one out of every twenty home loans in the nation.[5] Ocwen's revenue jumped from about $360 million in 2010 to a staggering $2.2 billion in 2014.[6]

---

[3] *See* Adam J. Levitin, *Robo-Singing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing*, before the House Financial Services Committee, Subcommittee on Housing and Community Opportunity, Nov. 18, 2010, available at http://financialservices.house.gov/Media/file/hearings/111/Levitin111810.pdf

[4] *See* Sarah Bloom Raskin, Member Board of Governors of the Federal Reserve System, Remarks at the National Consumer Law Center's Consumer Rights Litigation Conference, Boston Massachusetts, Nov. 12, 2010, available at www.federalreserve.gov/newsevents/speech/raskin20101112a.htm.

[5] *See* Karen Freifeld, Peter Rudegeair, and Andrew Hay, *NY regulator suspects Ocwen Financial of possible 'self-dealing'*, Reuters, Apr. 21, 2014, available at http://www.reuters.com/article/2014/04/21/ocwen-financial-letter-idUSL2N0ND0R120140421.

[6] James Sterngold and Saabira Chaudhuri, *Ocwen to Restate Results After Accounting Change*, WALL STREET J. (August 12, 2014), http://online.wsj.com/articles/ocwen-financial-to-restate-some-results-1407852143; *see also* Ocwen Financial Revenue and Net Income History, MACROTRENDS, http://www.macrotrends.net/stocks/charts/OCN/revenue/ocwen-finl-corp-revenue-net-income-history (last visited Apr. 3, 2018).

**20.**    Ocwen described its significant growth during this period in its annual report as follows:

"Our residential servicing portfolio has grown from 351,595 residential loans with an aggregate [unpaid principal balance ("UPB")] of $50.0 billion at December 31, 2009, to 2,861,918 residential loans with an aggregate UPB of $464.7 billion at December 31, 2013. Through acquisitions, we have substantially increased the share of our servicing portfolio that is made up of conventional (loans conforming to the underwriting standards of the government sponsored entities, the Federal National Mortgage Association (Fannie Mae) or the Federal Home Loan Mortgage Corporation (Freddie Mac) (collectively, the GSEs and Agency), government insured (loans insured by the Federal Housing Authority (FHA) of the Department of Housing and Urban Development (HUD) or Department of Veterans Affairs (VA) (collectively, government insured)) and prime non-Agency loans (loans generally conforming to the underwriting standards of the GSEs whose UPB exceeds the GSE loan limits, commonly referred to as jumbo loans). At December 31, 2013, these loans comprise 56.8% of the UPB of our servicing portfolio, up from 24.4% at December 31, 2012." [7]

**B.**    **The formation of Ocwen's conflicting business relationships**

**21.**    Ocwen developed technology services to reduce the cost of servicing loans, including software programs designed to manage homeowners' loan accounts and assess fees pursuant to protocols and policies designed by the executives at Ocwen.

**22.**    In August of 2009, Ocwen spun-off its technology platforms business into a separate company, Altisource.[8] As part of the separation, William C. Erbey, Ocwen's Chariman of the

---

[7] Ocwen Financial Corp, SEC FORM 10-K (Period Ending Dec. 31, 2013), http://www.sec.gov/Archives/edgar/data/873860/000144530514000799/a2013123110k.htm; *see also* Ocwen Financial Corp, SEC FORM 10-K (Period Ending Dec. 31, 2016), http://www.annualreports.com/HostedData/AnnualReports/PDF/NYSE_OCN_2016.pdf.

[8] Altisource was originally incorporated on November 4, 1999 in Luxembourg as Ocwen Luxembourg S.a r.1. See Altisource Portfolio Solutions S.A., SEC FORM 10-K (Period Ending Dec. 31, 2012), available at http:// www.sec.gov/Archives/edgar/data/1462418/000110465913009969/a13-2839_110k.htm (last visited Sept. 9, 2013). The entity was renamed Altisource Portfolio Solutions S.a r.1. on May 12, 2009, and converted into Altisource on June 5, 2009. *Id.* Prior to August 10, 2009, Altisource was a wholly-owned subsidiary of Ocwen. *Id.*

1    Board and the owner of 13% of Ocwen's common stock at the time, also became the Chairman

2    of the Board for Altisource.

3    **23.**    Ocwen contracted with Altisource to purchase mortgage and technology services under

4    service agreements that extend through 2025.[9] Ocwen quickly became Altisource's largest

5    customer, accounting for 60% of Altisource's total revenue in 2012. [10]

6    **24.**    Ocwen and Altisource became so interconnected that Altisource points to its relationship

7    with Ocwen as a potential "risk factor" to its business:

> "Given this close and continuing relationship with Ocwen, we may encounter
> difficulties in obtaining and retaining other customers who compete with Ocwen.
> Should these and other potential customers continue to view Altisource as part of
> Ocwen or as too closely related to or dependent upon Ocwen, they may be
> unwilling to utilize [Altisource's] services, and [Altisource's] growth could be
> inhibited as a result." [11]

15    **25.**    Ocwen's relationship with other public companies that are affiliated with Ocwen

16    was the subject of a letter from New York's Department of Financial Services sent to

17    Ocwen on February 26, 2014:

> "The Department's ongoing review of Ocwen's mortgage servicing practices has
> uncovered a number of potential conflicts of interest between Ocwen and other
> public companies with which Ocwen is closely affiliated. Indeed, the facts our
> review has uncovered to date cast serious doubts on recent public statements
> made by the company that Ocwen has a "strictly arms-length business
> relationship" with those companies. We are also concerned that this tangled web
> of conflicts could create incentives that harm borrowers and push homeowners
> unduly into foreclosure."
>
> …
>
> "Pursuant to the December 4, 2012 Consent Order between Ocwen and the
> Department, we have engaged an independent on-site compliance monitor at

---

[9] Altisource Portfolio Solutions S.A., SEC FORM 10-K (Period Ending Dec. 31, 2012), available at http:// www.sec.gov/Archives/edgar/data/1462418/000110465913009969/a13-2839_110k.htm.
[10] *Id.*
[11] *Id.*

Ocwen to conduct a comprehensive review of Ocwen's servicing operations. It is in the course of the monitorship that we uncovered these potential conflicts between and among Ocwen, Altisource Portfolio Solutions, S.A. ("Altisource Portfolio"), Altisource Residential Corporation, Altisource Asset Management Corporation, and Home Loan Servicing Solutions Ltd. (together, the "affiliated companies"), all of which are chaired by William C. Erbey, who is also the largest shareholder of each and the Executive Chairman of Ocwen."[12]

26.    New York's Department of Financial Services' letter went on to note that "Ocwen's management owns stock or stock options in the affiliated companies," which "raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of the affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result."[13]

27.    In April of 2014, another letter was sent to Ocwen concerning the interrelated nature of the independent competitors and their agreements:

"The relationship between Ocwen, Altisource Portfolio, and Hubzu raises signficiant concerns regarding self-dealing. In particular, it creates questions about whether those companies are charging inflated fees through conflicted business relationships, and thereby negatively impacting homeowners and mortgage investors. Alternatively, if the lower fees are necessary to attract non-Ocwen business on the open market, it raises concerns about whether Ocwen-serviced properties are being funneled into an uncompetitive platform at inflated costs."[14]

28.    The impact to homeowners nationwide is significant, because mortgage servicing "presents the extraordinary circumstance where there is effectively no customer to select a

---

[12] Letter from Benjamin M. Lawsky, Superintendent of Financial Services, New York State Department of Financial Services, to Timothy Hayes, General Counsel, Ocwen Financial Corporation (Feb. 26, 2014), available at http:// www.dfs.ny.gov/about/press2014/prl40226-letter.pdf (last visited, Nov. 5, 2014).

[13] *Id.*

[14] Letter from Benjamin M. Lawsky, Superintendent of Financial Services, New York State Department of Financial Services, to Timothy Hayes, General Counsel, Ocwen Financial Corporation (April 21, 2014), available at http:// www.housingwire.com/ext/resources/files/Editorial/Lawsky-Letter-to-Ocwen-RE-Altisource-Hubzu.pdf.

vendor for ancillary services," therefore, "Ocwen's use of related companies to provide such services raises concerns about whether such transactions are priced fairly and conducted at arms-length."[15]

**29.**    To this day, Ocwen has not produced evidence to any regulatory agency to refute the allegation that fees and costs charged to homeowners under agreements with third-parties are purposely inflated to the detriment of homeowners nationwide.[16]

**C.    The Conspiracy to Inflate Fees Charged to Borrowers Through the Use of Third-Party Services.**

**30.**    At all times material hereto, Ocwen, Altisource, other loan servicers, and the third-parties enlisted by those entities are independent businesses and competitors.

**31.**    Altisource, Ocwen, and other loan servicers who deal exclusively with Altisource, acted with a unity of purpose with third-party vendors to inflate fees and costs generated by default related services and lender placed insurance.

**32.**    Ocwen directs Altisource to order and coordinate default-related services, and Altisource places orders for such services with third-party vendors. The third-party vendors charge Altisource for the performance of the default related services, who then marks up the price, in numerous instances by 100% or more, and passes it along to Ocwen. Therefter, Ocwen bills the marked-up fees and costs to the borrower, increasing the balance owed.

**33.**    If Ocwen sells any of its MSRs to other loan servicers, those loan servicers will generally enter into exclusive dealing agreements with Altisource for the MSRs it acquires from Ocwen, to

---

[15] Letter from Benjamin M. Lawsky, Superintendent of Financial Services, New York State Department of Financial Services, to Timothy Hayes, General Counsel, Ocwen Financial Corporation (Aug. 4, 2014), available at http:// www.dfs.ny.gov/about/press2014/pr140804-ocwen-letter.pdf (last visited, Nov. 5, 2014).
[16] *Id.*

the same effect as detailed in the paragraph above.[17] Through this conspiracy with Altisource and other coconspirators, Ocwen is able to effectively circumvent the borrower protections in a mortgage contract.

**34.**    A mortgage contact generally consists of a promissory note (the "Note") and the mortgage/security instrument/deed of trust (the "Deed of Trust"). Mortgage contracts serviced by Ocwen are largely identical because they all conform to the standard Fannie Mae template. The contract contains certain disclosures describing what is supposed to happen if borrowers default on their loans.

**35.**    Plaintiff's Deed of Trust, as well as many other borrowers in the United States, provides that the loan servicer will "pay for whatever is reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument, including protecting and/or assessing the value of the property, and securing and/or repairing the property." *See* Ex. A.

**36.**    The Deed of Trust further provides that any amounts disbursed by the loan servicer or lender to a third party shall become additional debt of the homeowner secured by the Deed of Trust and shall bear interest at the Note rate from the date of disbursement. *Id.*

**37.**    Plaintiff's mortgage contract, together with the mortgage contracts of borrowers in the same situation as Plaintiff, provides that in the event of default, the homeowner will have to pay back costs and expenses incurred by the loan servicer or lender in enforcing the agreement. *Id.*

---

[17] Altisource Portfolio Solutions S.A., SEC FORM 10-K (Period Ending Dec. 31, 2017), https://www.sec.gov/Archives/edgar/data/1462418/000146241818000011/asps-12312017x10k.htm ("Entered into agreements with New Residential Investment Corp. (individually, together with one or more of its subsidiaries, or one or more of its subsidiaries individually, "NRZ") that establish Altisource as the exclusive provider of REO brokerage services for mortgage servicing rights ("MSRs") that NRZ agreed to acquire from Ocwen.").

**38.**    There is no provision disclosing to the borrower that the loan servicer or lender will engage in self-dealing or will mark-up the actual cost of those third party services, including mortgage insurance and escrow services, to make a profit from the borrower's delinquency.

**39.**    One example of a significant category of third-party default-related services utilized by Ocwen or subsequent servicers of Plaintiff's loan and other similar borrowers' loans is Broker Price Opinion ("BPO") fees, for which, in the furtherance of Ocwen's unlawful conspiracy, fees are assessed on homeowners' loan accounts with substantial undisclosed mark-ups, fraudulently generating revenue in the loan servicing business.

**40.**    By charging marked-up fees for BPOs, Ocwen violates the disclosures made to borrowers in the Note and Deed of Trust. *See* Ex. A. Furthermore, the wrongful nature of the marked-up fees is demonstrated by the fact that Ocwen and subsequent servicers conceal the marked-up profits assessed on homeowners' loan accounts.

**41.**    According to the National Association of BPO Professionals ("NABPOP"), the actual cost of a BPO is often as little as $30.[18] However, Ocwen regularly assesses fees for BPOs on borrowers' accounts in excess of $100, including on Plaintiff's account.

**42.**    Ocwen is aware that the actual cost of BPOs is significantly less than the fees it charges to borrowers. Ocwen has a significant amount of experience in the BPO marketplace. Beginning in mid-2000, Ocwen Federal Bank FSB ("Ocwen Bank"), a former wholly-owned subsidiary of Ocwen, began "selling" marked-up BPOs to Wall Street firms acquiring large pools of underperforming loans.

---

[18] See National Association of BPO Professionals (NABPOP), Broker Price Opinion -BPO Brief, available at http://www.nabpop.org/Advocacy-BPOBrief-2.php.

COMPLAINT                                                                                    14

**43.**    The above-described conduct was the subject of a case known as *Cartel Asset Management v. Ocwen Financial Corp.,* Case No. 1:01-cv-01644-REB-CBS (D. Colo.) ("*Cartel*"). In *Cartel,* Ocwen was sued for the theft of a confidential list of experienced, responsive, and competent realtors who produced high-quality BPOs. Ocwen had secretly copied the names and contact information of realtors identified on BPOs that it purchased from the Plaintiff in *Cartel*, and then embedded the stolen information into its own incomplete database of BPO providers. [19]

**44.**    In *Cartel*, Ocwen's Executive Chairman offered the following testimony, under oath and penalty of perjury, concerning Ocwen's BPO business:

> "[A]s of 2004, [Ocwen] Bank would pay an agent or broker approximately $45 to $50 to provide a BPO and then sell the BPO for a profit. A reviewed BPO would be sold for approximately $150 and an unreviewed BPO for approximately $70."[20]

**45.**    Another fee or cost that is significantly marked-up includes title examination and/or title search fees. Title related fees assessed by Ocwen and charged to borrowers and Plaintiff are significantly marked-up, at times exceeding $800. Moreover, fees and costs incurred by hiring "property preservation" vendors are commonly marked up. Plaintiff was excessively charged for "property preservation" fees by Ocwen and subsequent loan servicers of Plaintiff's mortgage loan. Plaintiff was also charged for escrow fees related to property taxes and for the balance of tax payments forwarded by Ocwen into escrow, despite having made payments for property taxes himself.

---

[19] See *Cartel*, Case No. 1:01-cv-01644-REB-CBS, Dkt. 438 at 1-4 (D. Colo. Sept. 18, 2007).
[20] *Id.,* Dkt. 438 at 25.

**46.**     The above described costs and fees are not exclusive. Ocwen and subsequent servicers participating with Ocwen and the conspiracy between Ocwen and Altisource charged marked up fees related to several other types of third party services and mortgage insurance for lender placed insurance.

**47.**     To conceal its activities and mislead homeowners about the true nature of its actions, Ocwen employed a corporate practice that omits the true nature of the fees that are being assessed on homeowners' loan accounts. These practices are common to all of Ocwen's files, as well as the files of subsequent servicers who purchase MSRs from Ocwen and are part of the above-described conspiracy.

**D.      The Harm to Borrowers in the Market as a Whole.**

**48.**     In addition to the direct monetary damages caused to homeowners, in the form of the difference between the actual cost of the services provided and the marked-up fees assessed on homeowners' loan accounts, homeowners suffer other, less obvious injuries as a result of the practices described herein.

**49.**     The assessment of these marked-up fees can make it impossible for homeowners to become current on their loan. Charges for such default-related services can add hundreds or thousands of dollars to homeowners' loans over time, driving them further into default.

**50.**     The conspiracy between Ocwen, Altisource, and other third-party vendors has the effect of fixing the price charged to borrowers by horizontally situated third-party vendors and insurers, and leaves borrowers with the choice of either losing their home, or funneling unearned money to Ocwen and Altisource to prevent foreclosure.

**51.**     When homeowners get behind on their mortgage, and fees for these default-related services are stacked on to the past-due principal and interest payments, homeowners are faced

1   with an insurmountably high payment required to prevent Ocwen from foreclosing on the loan

2   and selling the borrower's home. When a homeowner makes a payment or a credit is received by

3   the servicer, part of the payment is applied to the fees first, making the remaining balance

4   insufficient to cover the entire monthly payment, which makes the payment late, and causes

5   more fees to be assessed to the overall balance owed by the homeowner.

6   **52.**    The uncompetitive environment created by Ocwen and Altisource's agreement creates an

7   incentive for Ocwen to drive a borrower into default and foreclose on the property prematurely

8   and after assessing thousands of dollars in inflated fees to the balance of the loan. By foreclosing

9   on the mortgage after assessing the maximum amount of unjustifiably high fees and costs,

10  Ocwen and other loan servicers are unjustly enriched by mortgage insurance and other

11  agreements made in anticipation of foreclosure and the eventual rehabilitation and/or resale of

12  the borrower's property.

13  **53.**    These practices result in premature or wrongful foreclosures nationwide, and

14  substantially contributed to the foreclosure and sale of the subject-property that gave rise to this

15  litigation.

16  ### FACTS SUPPORTING CLAIMS

17  **54.**    At all times relevant hereto, Plaintiff was the owner of the subject-property of this action

18  commonly known as 305 Kirk Avenue, Brownsville, Oregon, 97327. The subject-property was

19  secured by a Deed of Trust (the "Deed of Trust") to Mortgage Electronic Registration Systems,

20  Inc., solely as nominee for Quicken Loans, Inc. *See* Ex. A.

21  **55.**    The beneficial interest in the Deed of Trust was subsequently assigned by Mortgage

22  Electronic Registration Systems, Inc., solely as nominee for with Quicken Loans, Inc. to

1    OneWest Bank, FSB, pursuant to an Assignment of Deed of Trust recorded on December 21,

2    2011 under Linn County recording number 2011-17933.

3    **56.**    On or about April 19, 2012, OneWest Bank FSB filed a Foreclosure Complaint against

4    Plaintiff in Linn County Case No. 120991. On or about May 29, 2013, OneWest Bank, FSB filed

5    a Motion for Summary Judgment, but no order was ever prepared by OneWest Bank, FSB, nor

6    entered by the court.

7    **57.**    On June 13, 2013, OneWest Bank, FSB entered into a mortgage servicing rights purchase

8    and sale agreement with Ocwen, pursuant to which Ocwen agreed to purchase approximately

9    $78 billion in unpaid principal balance of mortgage servicing rights and related servicing

10   advance receivables, in each case, measured as of April 30, 2013.

11   **58.**    On or about October 30, 2013, Ocwen was assigned the beneficial interest in Plaintiff's

12   Deed of Trust by OneWest Bank, FSB. Subsequently, OneWest Bank, FSB filed a motion to

13   substitute Ocwen into the foreclosure case against Plaintiff. On January 31, 2014, the trial court

14   entered an order allowing Ocwen to substitute for OneWest Bank, FSB.

15   **59.**    Following Ocwen's above-described acquisition and assignment, Ocwen continued its

16   collection efforts by harassing Plaintiff at his home, traveling to Plaintiff's property to unsettle

17   Plaintiff's tenants, and ignoring or denying Plaintiff's attempts to modify the loan or otherwise

18   recover from Plaintiff's default status. Plaintiff made numerous attempts to request information

19   from Defendants but was repeatedly ignored, provided with minimal information unrelated to

20   Plaintiff's specific requests, including but not limited to the history of the chain of title to the

21   Note and Deed of Trust.

22   **60.**    Ocwen also assessed inflated fees and costs to Plaintiff's mortgage balance, including

23   fees and costs for appraisals by third-parties contracting with Altisource, lender-placed insurance

1   fees and costs, escrow account annual fees, and other artificially inflated expenses that were

2   undisclosed to Plaintiff. All of the unlawfully marked-up fees for third-party services charged to

3   Plaintiff by Ocwen subjected Plaintiff to an unlawful debt and placed Plaintiff in constant fear of

4   imminent foreclosure.

5   **61.**    Ocwen alone maintains a complete accounting of all fees assessed and paid, and the

6   details of each and every fee assessed and paid cannot be alleged with complete precision

7   without access to Ocwen's records. Plaintiff has attempted to obtain these records from Ocwen

8   and its successors, but has routinely been denied access to this information.

9   **62.**    Following Ocwen's substitution into the foreclosure action against Plaintiff, Ocwen filed

10   several motions to continue but otherwise failed to prosecute the action until the case was

11   dismissed by the trial court on February 4, 2015.

12   **63.**    On or about February 10, 2015, Defendant Ocwen filed motions to reinstate the case and

13   for judgment against Mr. Neagle for the subject-debt. The trial court granted the motions and

14   entered a judgment against Plaintiff on or about February 17, 2015.

15   **64.**    On or about January 8, 2016, Plaintiff filed a Motion to Vacate the Order Reinstating

16   Ocwen's collection case against Plaintiff. Plaintiff had not received notice that the case was

17   reinstated until October of 2015, when Plaintiff received notice of the Sherriff's intent to sell

18   Plaintiff's property. Ocwen did not file a response or otherwise defend against Plaintiff's Motion

19   to Vacate.

20   **65.**    On or about January 12, 2016, Plaintiff filed a petition for bankruptcy, which resulted in

21   an automatic bankruptcy stay of Ocwen's foreclosure action against Plaintiff under 11 U.S.C.A.

22   § 362(a).

**66.**    Ocwen failed to appear at the hearing on Plaintiff's Motion to Vacate the order

reinstating the foreclosure action against Plaintiff. As a result, the trial court vacated the order

reinstating Ocwen's foreclosure action against Plaintiff, dismissing it again on February 5, 2016.

**67.**    On or about February 17, 2016, while Plaintiff's automatic bankruptcy stay was still

active, Ocwen filed another motion to reinstate the foreclosure action. Ocwen, through its

counsel, admitted that it was completely aware that an automatic bankruptcy stay was active, and

attached Plaintiff's petition for bankruptcy to its motion.

**68.**    The trial court granted Ocwen's motion and entered another order reinstating the

foreclosure action against Plaintiff on February 18, 2016.

**69.**    On or about May 3, 2016, Ocwen filed an Assignment of Judgment purporting to assign

all right title, and interest in Plaintiff's property, including the rights as judgment creditor for

Plaintiff's property, to MTGLQ Investors, L.P. MTGLQ simultaneously filed a Praecipe for Writ

of Execution, instructing the Linn County Sheriff to sell Plaintiff's property at a public auction.

The Linn County Sheriff sold Plaintiff's home and property to MTLGQ on July 19, 2016.

**70.**    At that public auction, MTGLQ Investors, L.P. instructed the Linn County Sheriff to

accept a bid in the amount of $119,000.00, pursuant to ORS §18.963. Under the statute, the bid

submitted by MTGLQ was automatically accepted by the Linn County Sheriff. *See* Or. Rev. Stat.

Ann. § 18.936(3) ("A judgment creditor that makes a bid under subsection (2) of this section

may instruct the sheriff to accept any bid that matches the amount of the judgment creditor's

bid.").

**71.**    On or about July 9, 2016, Plaintiff filed a Motion to Vacate the order that reinstated the

case after the automatic bankruptcy stay started. A hearing was scheduled for August 3, 2016. At

the hearing, Ocwen and MTGLQ, through counsel, acknowledged that the violation of the

1    automatic stay was intentional. As a result, Plaintiff's Motion to Vacate was granted, and an

2    order to that effect was entered by the trial court on August 23, 2016, dismissing the case in

3    favor of Plaintiff.

4    **72.**    On or about August 12, 2016, MTGLQ filed a motion requesting reconsideration of the

5    holding in favor of Plaintiff. A hearing was scheduled on December 5, 2016, and MTGLQ's

6    motion was denied.

7    **73.**    This pattern of premature or wrongful foreclosures by Ocwen and its affiliates is a

8    widespread practice. Below is a chart from one of Ocwen's Dual Tracking Reports. The chart

9    catalogues instances where Ocwen initiated a foreclosure proceeding even though Ocwen had

10   placed a foreclosure "hold" on the loan, a process known as "dual tracking." The chart identifies

11   the reason or root cause for each "[d]ual [t]rack violation," such as "attorney proceeded while the

12   file was on hold." The chart shows that, by Ocwen's own analyisis, between November 2015 and

13   April 2016, one month before the sheriff's sale of Plaintiff's property, Ocwen attorneys initiated

14   one hundred and twenty foreclosure proceedings when the subject loan was subject to a

15   foreclosure hold.



**74.**     Plaintiff reserves the right to amend Plaintiff's Complaint if new claims arise as the facts

develop.

**FIRST CLAIM FOR RELIEF: UNLAWFUL COMBINATION AND CONSPIRACY IN**

**RESTRAINT OF TRADE AND COMMERCE IN VIOLATION OF 15 U.S.C.A. §§ 1, 15,**

**26**

**75.**     Plaintiff realleges and incorporates by reference all the above paragraphs with the same

force and effect as if herein set forth.

**76.**     Ocwen, Altisource, and other co-conspirators involved in Defendants' anticompetitive

business practices described above (collectively, "Defendants"), including other Defendants

alleged herein, entered into and engaged in a conspiracy in restraint of trade in violation of

Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C.A. § 1.

**77.**     Defendants intended to, and actually did, unreasonably restrain trade by engaging in a

continuing combination and conspiracy to artificially inflate the prices and cost of third-party

services billed to or by Defendants which were ultimately charged to homeowners. Defendants also intended to, and actually did, unreasonably restrain trade by engaging in a continuing combination and conspiracy to artificially inflate, stabilize, or otherwise fix the balance of mortgage loans in the nonbank subprime mortgage loan servicing market.

**78.**    Defendants' conspiracy is a per se violation of the Sherman Act, and in the alternative, the conspiracy is an unreasonable restraint of competition, trade, and commerce in the nonbank subprime mortgage loan servicing market. The fees and costs that were inflated as a direct and proximate result of Defendants' agreement, as well as the pooling and servicing agreement which Ocwen operated under while servicing Plaintiff's mortgage loan, were related to the following non-exhaustive list of items:

      i.      Appraisals by third parties;

      ii.      Bankruptcy/Foreclosure Attorney Fees;

      iii.      Bankruptcy/Foreclosure costs;

      iv.      Broker Price Opinions;

      v.      Insurance premiums;

      vi.      Late payment fees;

      vii.      Partial release of property fees;

      viii.      Property inspection costs;

      vix.      Property preservation costs;

      x.      Refinance Assignment Fees;

      xi.      Reconveyance costs;

      xii.      Title Searches;

      xiv.      Escrow Overdrafts;

xv.    Lender-placed or "force-placed" insurance acquisition and maintenance; and

xvi.    Legal posting services.

**79.**    Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially fixing, tying, raising, pegging, maintaining, and stabilizing the price and output of the non-exhaustive list of costs and fees described in paragraph 75 herein, and of the balance of mortgage loans serviced by Defendants and other coconspirators.

**80.**    Defendants' practices had a substantial impact on competition in the nonbank subprime mortgage loan servicing market, and all other relevant markets and submarkets in the United States in which Defendants participated.

**81.**    Defendants devised a scheme to deceive homeowners who are behind on their mortgage payments into paying hundreds or thousands of dollars in unlawfully marked-up fees, which resulted in artificially inflated loan balances, which resulted in increased profits to Ocwen and other coconspirators. As a direct and proximate result of Defendants' conspiracy, homeowners subjected to Ocwen's practices face artificially inflated loan balances regardless of who services the loan after Ocwen assigns the servicing rights to a subsequent servicer.

**82.**    Defendants, by their unlawful conspiracy and overt acts in furtherance thereof, did in fact artificially fix, raise, peg, maintain, and stabilize the price and output of third-party fees and costs, including those described in paragraph 75 herein, and mortgage balances nationwide. Defendants' conduct caused Plaintiff and other homeowners to be charged inflated prices with no alternative remedy.

**83.**    Defendants' conspiracy directly and proximately caused substantial anticompetitive effects in the market for nonbank subprime mortgage loan servicing in the United States, as well as the other relevant markets alleged herein in which Defendants participated. There is no

COMPLAINT

24

1    legitimate business justification for, or procompetitive benefits caused by, Defendants'

2    unreasonable restraint of trade. Any ostensible or proffered procompetitive benefit was or is

3    pretextual and/or could have been achieved by less restrictive means.

4    **84.**    The conspiracy has injured competition and consumers in the market for non-bank

5    subprime mortgage loan servicing in the United States. As a direct and proximate result of

6    Defendants' agreement, borrowers are funneled into an uncompetitive platform of independent

7    Ocwen affiliated entities and charged inflated fees and costs, which adds to the balance owed by

8    the borrower, increasing the fees which Defendants charge that are commensurate to the balance

9    owed on the mortgage.

10   **85.**    Plaintiff has been injured in his business and property by reason of Defendants'

11   violations of the Sherman Act, within the meaning of the Clayton Act, 15 U.S.C.A. § 15. As a

12   direct and proximate result of the above-described combination and conspiracy, Plaintiff was

13   charged inflated fees and costs, including, but not limited to, those alleged in paragraph 75

14   herein, and Plaintiff's mortgage balance was wrongfully inflated as a direct and proximate result

15   of Defendants' combination and conspiracy. Plaintiff was also subjected to debt collection

16   activities for an unlawful debt resulting from Defendants' unlawful combination and conspiracy.

17   **86.**    Plaintiff and other borrowers in a similar position as Plaintiff are threatened with further

18   injury to business and property by reason of Defendants' continuing violations of the Sherman

19   Act, within the meaning of the Clayton Act, 15 U.S.C.A. § 26. To this day, Ocwen continues

20   rapidly acquiring mortgage servicing rights across the nation, and still operates pursuant to an

21   exclusive dealing agreement with Altisource that runs through at least the year 2025, and which

22   enables Ocwen to perpetually charge homeowners unlawfully inflated fees in the furtherance of

23   Defendants' combination and conspiracy.

**87.**     As a direct and proximate result of Defendants' conspiracy, Plaintiff has been deprived of the benefits of free, open, and unrestricted competition. The injury to Plaintiff and other homeowners is of the type the antitrust laws were designed to prevent and flows from that conduct which makes Defendants' acts unlawful. Pursuant to the agreement, Ocwen willfully accepts inflated fees and costs from Altisource, unjustly enriching Defendants when the expenses are passed on to the borrower increasing the balance of the borrower's loan. In the absence of Defendants' conspiracy, homeowners nationwide would not be suffering threats of imminent foreclosure due to unlawfully inflated mortgage loan balances, instead, third-party vendors would compete to charge the lowest price for services, and loan servicers would purchase only from those entities that obtain those services at the lowest cost.

**SECOND CLAIM FOR RELIEF: UNLAWFUL MONOPOLIZATION, ATTEMPT, OR CONSPIRACY TO MONOPOLIZE IN VIOLATION OF 15 U.S.C.A. § 2, 15, 26**

**88.**     Plaintiff realleges and incorporates by reference all the above paragraphs with the same force and effect as if herein set forth.

**89.**     At all times material hereto, Ocwen did specifically intend to and actually has monopolized, attempted to monopolize, and conspired to monopolize the interstate trade and commerce in the nonbank subprime mortgage loan servicing market in violation of Section 2 of the Sherman Act. 15 U.S.C.A. § 2.

**90.**     In the alternative, Ocwen and Altisource intended, conspired, and attempted to monopolize the nonbank subprime mortgage loan servicing market.

**91.**     At all times relevant hereto, Ocwen's market share has rapidly increased to the extent that Ocwen services a monopoly share of the nonbank subprime loan servicing market, with like effect for Altisource's market share of its relevant market in purchasing third party services on

behalf of Ocwen. As a result, Ocwen and Altisource have violated the provisions of the Sherman Act, 15 U.S.C. § 2 et seq., and the Clayton Act, 15 U.S.C. § 15, by conspiring and attempting to monopolize each party's respective market.

**92.**     The conspiracy complained of has been in continuous existence since its inception in August of 2009, and has been participated in for varying periods and in varying degrees by each of the Defendants and other coconspirators.

**93.**     At all times relevant hereto, various measures were adopted by Ocwen and Altisource in furtherance of Ocwen and Altisource's attempt and conspiracy to monopolize the nonbank subprime mortgage servicing market and relevant submarkets. Among such measures are:

    i.     Ocwen's exclusive dealing agreement with Altisource that extends through 2025;

    ii.    Altisource's exclusive dealing agreements with loan servicers that purchase MSRs from Ocwen's servicing portfolio;

    iii.   Ocwen's rapid acquisition of billions of dollars of MSRs and the assets of other loan servicing agencies to establish monopoly power;

    iv.   Ocwen and Altisource's inflation of third party costs and other predatory pricing resulting in higher than average returns guaranteed to entities doing business with Ocwen and Altisource, and the resulting exclusion of other competitors from the market that are unable to guarantee such returns; and

    v.    The interrelated and conflicting nature of the business relationships between Ocwen, Altisource, and other coconspirators.

**94.**     As a direct result of the combination and conspiracy alleged herein, Ocwen and Altisource's power and influence has greatly increased, and the number of independent third-party service providers, loan servicers, and competitors throughout the United States has

significantly decreased. As a further and direct result of this conspiracy, interstate trade and commerce in the nonbank subprime mortgage loan servicing industry is restrained and prevented in such a manner and to such an extent that homeowners nationwide are funneled into an uncompetitive platform administered by Ocwen and Altisource, which forces homeowners to pay unlawfully inflated loans, insurance, fees, and costs with no reasonable alternative or remedy.

**95.**    The acts on the part of Defendants were in restraint of trade and did constitute a monopoly and/or monopsony, and were and are an attempt and conspiracy to monopolize, and/or establish a monopsony, and by reason of the agreement between Ocwen, Altisource, insurers, third-party service providers, and other coconspirators, Plaintiff was subjected to predatory collection efforts arising from costs and fees that Plaintiff, and homeowners similar to Plaintiff nationwide, should never have been charged. The predatory pricing perpetuated by Ocwen and Altisource resulted in the exclusion of independent competition that would have driven down the expenses charged to homeowners for default related services.

**96.**    Pursuant to and in furtherance of the monopolization and attempt and conspiracy to monopolize or establish a monopsony, Defendants have done, among other acts alleged herein, the following:

    i.    Maintained pricing policies, including the quoting of a single price for servicing fees, mortgage insurance premiums, late fees, and other fees or nonrefundable costs charged to a homeowner by Ocwen or Altisource, or paid as compensation pursuant to a contract with a trust, lender, competitor, third-party, or other entity, that (1) discriminated among borrowers by excessively charging fees and costs to subprime borrowers to guarantee returns derived therefrom to affiliates in a manner that unreasonably inhibited the entry or growth of competitors; and (2)

limited the development and scope of activities of an independent nonbank

subprime loan servicing industry, and relevant submarkets, as a result of which

the ability of Ocwen and Altisource's competitors to compete effectively was

unreasonably impaired;

ii.    Restrained and attempted to restrain competitors from entering or remaining in

the loan servicing market by specifically targeting subprime mortgage loans, with

unusually low profit expectations, in those segments of the market where

competitors had or appeared likely to have unusual competitive success;

iii.    Engaged in various pricing and marketing practices with regard to loan servicing,

foreclosures, mortgage liquidation, mortgage insurance, and other default related

services for the purpose or with the effect of restraining or attempting to restrain

competitors from entering, remaining in, or expanding in the market for nonbank

subprime mortgage loan servicing or in its submarkets; and

iv.    Maintained pricing and marketing policies, especially with regard to purchasing

third-party services provided by Altisource and agreeing to exclusively do so

from Altisource, that had the purpose or effect of creating or maintaining a lease-

oriented environment so as to raise the barriers to entry or expansion in the

nonbank subprime mortgage loan servicing market or relevant submarkets.

**THIRD CLAIM FOR RELIEF: VIOLATION OF 42 U.S.C. § 1983**

**97.**    Plaintiff incorporates by reference all the above related paragraphs with the same force

and effect as if herein set forth.

**98.**    At the behest of Defendants, and as a direct and proximate result of Defendants' conduct,

the foreclosure action against Plaintiff was wrongfully reactivated, and the Linn County Sheriff

COMPLAINT                                                                                        29

sold Plaintiff's home and property on or about July 19, 2016 to the benefit of Defendants. As a result, state power and prestige were placed behind Defendants to support Defendants' actions.

**99.**    Defendants took advantage of the laws, customs, policies, practices, and procedures of the State of Oregon and the Oregon Courts, and acted under color of law and statute to deprive Plaintiff of his property without due process of law, with the help of state officials, in violation of the rights secured to Plaintiff by the Constitution of the United States of America.

**100.**    Title 42 of United States Code, section 1983 provides for damages in a civil action based upon the deprivation of rights guaranteed by the United States Constitution.

**101.**    The 14th Amendment of the United States Constitution protects individuals from a state actor or the equivalent depriving individuals of, "life, liberty, or property, without due process of law" and from such an actor denying "any person within its jurisdiction the equal protection of the laws." U.S. Amend. XIV.

**102.**    Defendants, through their agents, employees, coconspirators, and representatives, have a practice, policy, and custom of violating consumer financial protection laws and bankruptcy laws that are enacted to protect the interests and rights of homeowners. As a direct and proximate result of Defendants' practices and customs, Defendants are incentivized to wrongfully and prematurely foreclose on properties with deliberate indifference to the propriety of the foreclosure.

**103.**    Defendants have a nationwide practice and custom of keeping inadequate records which facilitates ignorance to requirements designed to protect the interests of homeowners. Defendants have a policy, practice, and custom of taking advantage of procedural defects or deficiencies in state and federal statutory schemes to deprive individuals of their constitutional rights.

**104.**    At all relevant times hereto, Defendants acted pursuant to those policies, practices, customs, and procedures, under color of law and/or statute, and with a deliberate indifference to Plaintiff's constitutional rights. Furthermore, Defendants' policies, procedures, and customs have failed to ensure that, prior to transferring loans to a new servicer, Ocwen has disclosed known inaccuracies and errors that may or have impacted the accuracy or completeness of the transferred borrower loan records and the new servicer's ability to comply with applicable law.

**105.**    Defendants, with deliberate indifference to Plaintiff's rights and privileges and the rights and privileges of those similarly situated, allowed Plaintiff to be deprived of his rights and privileges secured to him by the Constitution of the United States.

**106.**    Defendants acted with conscious disregard to Plaintiff's rights and privileges by failing to follow and enforce the policies, practices, procedures, and customs that were meant to protect Plaintiffs rights and privileges, and the rights and privileges of others similarly situated, or by facilitating violations or ignorance of those policies, practices, customs, and procedures.

**107.**    Plaintiff's career depends on his business reputation, his public image, and his ability to provide his customers with properties to live in without interference from foreclosures and debt collectors. The acts and omissions of Defendants were the direct and proximate cause of Plaintiff's damages, which include harm to Plaintiff's business and career, finances, lifestyle, past and future income, business relationships, and reputation. Furthermore, Plaintiff suffered mental anguish and emotional distress from the threat of imminent foreclosure and inability to pay Plaintiff's unlawfully inflated mortgage loan balance, and significant impairment of Plaintiff's livelihood as a direct and proximate result of Defendants' above-described conduct and debt collection activities.

**108.** On the part of all actors involved, the above-described conduct constituted actionable economic and non-economic damages in violation of clearly established law and deprived Plaintiff of his rights to life, liberty and property guaranteed under the 14th and 5th Amendments to the United States Constitution, for which Defendants liable to Plaintiff under 42 U.S.C. § 1983.

### FOURTH CLAIM FOR RELIEF: FINANCIAL ELDER ABUSE

**109.** Plaintiff incorporates by reference all the above related paragraphs with the same force and effect as if herein set forth.

**110.** At all times relevant hereto, Plaintiff was 65 years of age or older and an "elderly person" as defined by Or. Rev. Stat. Ann. § 124.100 (1)(a). Defendants knew or should have known that Plaintiff was an "elderly person" and in a protected class under Or. Rev. Stat. Ann. § 124.100 (1)(a).

**111.** Defendants' above-described conduct constituted "financial abuse" as defined by Or. Rev. Stat. Ann. § 124.110 (1). Defendants wrongfully took and withheld the property of Plaintiff, and wrongfully charged Plaintiff inflated prices and costs, without good cause and in bad faith, despite the fact that Defendants knew or should have known that Plaintiff was a "vulnerable person" as defined by Or. Rev. Stat. Ann. § 124.100 (1)(e).

**112.** Defendants' above-described conduct was taken with the intent to deprive Plaintiff of his property in violation of the laws of the United States of America, the laws of the State of Oregon, and in violation of Plaintiff's rights secured to him by the Constitution of the United States.

**113.** As a direct and proximate result of Defendants' conduct, Plaintiff suffered economic damages in the form of harm to Plaintiff's business and career, loss of income, impairment of

past and future earning capacity, economically verifiable damage to reputation, and costs incurred due to loss of use of property.

## PROXIMATE CAUSE

**114.**    Plaintiff incorporates by reference all the above-related paragraphs with the same force and effect as if herein set forth.

**115.**    Each of the foregoing acts and omissions, whether taken separately or collectively by any Defendant named herein, and whether taken in the furtherance of individual or collective interest, all constituted a direct and proximate cause of the injuries and damages to Plaintiff set-forth herein.

## PUNITIVE DAMAGES

**116.**    The acts and omissions of all Defendants named herein not only shocks the conscience, but also satisfies the criteria for punitive damages, as contemplated by Section 1983.

## ATTORNEY FEES

**117.**    It was necessary for plaintiff to retain the undersigned attorneys to file this lawsuit. Upon judgment, Plaintiff are entitled to an award of attorney fees and costs pursuant to 42 U.S.C. §1988(b) and other applicable law alleged herein.

## DEMAND FOR JURY TRIAL

**118.**    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial for all issues in this matter.

1         WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, in

2 an amount sufficient to fully compensate Plaintiff for his above-stated damages, judgment for

3 punitive and exemplary damages, recovery of attorney's fees for the preparation and trial of this

4 cause of action, and for its appeal if required, pursuant to 42 U.S.C. §1988; together with pre-

5 and post-judgment interest, and court costs expended herein, and for such other relief as this

6 Court deems just and proper.

7

8 DATED MAY 1, 2018.


                                          *s/ William L. Ghiorso*
                                          William L. Ghiorso, OSB# 902706
                                          Ghiorso Law Office
                                          494 State Street, Suite 300
                                          Salem, Oregon 97301
                                          Telephone: (503) 362-8966
                                          Bill@ghiorsolawoffice.com
                                          Attorney for Plaintiff