IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MELVIN RAY NEAGLE,

    Plaintiff,

  v.

THE GOLDMAN SACHS GROUP, INC,
a Delaware Corporation d/b/a MTGLQ
INVESTORS, L.P., a Delaware Limited
Parnership; OCWEN FINANCIAL CORP., a
Florida Corporation; OCWEN MORTGAGE
SERVICING, INC. a U.S. Virgin Islands
Corporation; OCWEN LOAN SERVICING,
LLC, a Delaware Limited Liability Company;
ALTISOURCE SOLUTIONS, INCL, a
Delaware Corporation,

    Defendants.

_____

Case No. 6:18-cv-00754-MC

OPINION AND ORDER

MCSHANE, Judge:

  As observed by the First Circuit over a decade ago, "[s]ome antitrust cases are intrinsically hopeless because . . . they merely dress up in antitrust garb what is, at best, a business tort or contract violation." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 69 (2004). The same can be said of allegations based on the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. § 1962 *et seq* ("RICO"). Here, in the course of alleging that his deed of trust did not allow certain third-party default-related service

1 – OPINION AND ORDER

fees, plaintiff Melvin Neagle dresses up his complaint in both antitrust and RICO garb. While Neagle's complaint is long on pages and conclusory allegations, it is short on specific factual detail as to how these defendants violated antitrust or RICO laws while servicing Neagle's loan. Although he relies heavily on a Consent Order agreed to between his loan servicer and New York state regulators, none of the acts described in that case involve acts Neagle alleges the servicer did here. Because Neagle fails to state an antitrust, RICO, or financial elder abuse claim, defendants' motions to dismiss are granted.

## BACKGROUND[1]

Neagle purchases foreclosed homes at auction and rents them or sells them later for a profit. The Ocwen defendants engage in mortgage loan servicing. Ocwen Loan Servicing, LLC is a wholly owned subsidiary of Ocwen Mortgaging Servicing, Inc., which in turn is a wholly owned subsidiary of Ocwen Financial Corporation. "Founded in 1988 by William C. Erbey, Ocwen quickly became the largest non-bank loan servicer in the United States, and the fourth-largest servicer of mortgages generally." Second Am. Compl. (SAC) ¶ 14. "As a non-bank mortgage loan servicer, Ocwen is responsible for the collection and remittance of principal and interest payments, the administration of escrow accounts, the collection of insurance claims, the management of loans that are in default, and foreclosures." SAC ¶ 19.

In 2009, defendant Altisource Solutions, Inc. "was spun off from Ocwen and became a completely independent company. Altisource is now the exclusive entity that provides Ocwen with third-party services relating to Ocwen's practices in the nonbank mortgage loan servicing market pursuant to a series of exclusive dealing arrangements, with a specific focus on subprime

---

[1] At the motion to dismiss stage, I accept the allegations of the non-moving party, here Neagle, as true.

loans."[2] SAC ¶ 15. Defendant MTQLP Investors, L.P. "primarily performs mortgage liquidation[.]" SAC ¶ 16.

Neagle sets out the history of loans and the loan servicing industry, including in the aftermath of the housing market crash. Traditionally, banks serviced loans themselves and had a financial interest in the repayment of the loan. After the crash, servicing loans became unprofitable for banks. "Today, banks are reluctant to enter the market as a competitor of Ocwen, which has allowed Ocwen to dominate as a non-bank mortgage loan servicer that specializes in subprime loans." SAC ¶ 22. Nonbank servicers like Ocwen have "a cost advantage relative to bank servicers in handling nonperforming loans. That cost advantage stemmed from both their specialization in this type of servicing and from their ability to harness technological innovations in order to reduce costs." SAC ¶ 22.

Ocwen is paid in contractual monthly servicing fees by the owner of the loan, often under a pooling and servicing agreement (PSA) with investors or noteholders. "Ocwen and other loan servicers asses fees on borrowers' accounts for services provided by third-parties, or for Ocwen's servicing itself. The fees and costs include, among other things, broker's price opinion ("BPO") fees, appraisal fees, title search fees, various 'technology' fees, late fees, escrow fees, and other ancillary fees." SAC ¶ 24. While a bank who services its own loans is concerned with interest profit, "Ocwen's primary concern as a loan servicer is to generate as much revenue as possible from fees and costs assessed against the mortgage accounts that it services." SAC ¶ 25.

---

[2] As discussed below, there is nothing sinister about these "exclusive dealing arrangements." The Services Agreement is a fairly standard contract one finds whenever one company agrees to provide set goods or services to another company over a given time period. As discussed below, Neagle fails to allege this agreement results in a substantial foreclosure of the market for third-party default-related services market.

3 – OPINION AND ORDER

After the housing market crash, Ocwen rapidly grew its business, going from $360

million in revenues in 2010 to $2.2 billion in revenues in 2014. SAC ¶ 27. Much of Ocwen's

growth came from "massive acquisitions:"

> Due to the massive amounts of acquisitions by Ocwen, coupled with the
> reluctance of financial institutions to enter the servicing market as a competitor,
> Ocwen rapidly exapanded as a nonbank loan servicer that specialized in subprime
> loans. But the end of 2014, Ocwen serviced over 50% of all subprime mortgage
> loans in the nation.

SAC ¶ 29 (internal citation omitted).

"Ocwen developed technology services to reduce the cost of servicing loans, including

software programs designed to manage homeowners' loan accounts and assess fees pursuant to

protocols and policies designed by the executives at Ocwen." SAC ¶ 30. "In August of 2009,

Ocwen spun-off its technology platforms business into a separate company, Altisource." SAC ¶

31. Ocwen's Chairman of the Board, who owned 13% of Ocwen's stock, took the same position

at Altisource. "Other key executives shared positions with Altisource as well." SAC ¶ 31.

"Ocwen contracted with Altisource to purchase mortgage and technology services under

service agreements that extend through 2025. Ocwen quickly became Altisource's largest

customer, accounting for over 80% of Altisource's total revenue in 2014." SAC ¶ 32.

"Altisource's revenues more than tripled between 2010 and 2014." SAC ¶ 52.

The close relationship between Ocwen and Altisource (and other "closely affiliated"

companies) led to an investigation by the New York Department of Financial Services." *See*

SAC ¶ 34 (quoting letter from regulators stating an "ongoing review of Ocwen's mortgage

servicing practices has uncovered a number of potential conflicts of interest between Ocwen and

other public companies with which Ocwen is closely affiliated."). Regulators questioned whether

Ocwen had an "arms-length business relationship" with the affiliated companies and were

4 – OPINION AND ORDER

"concerned that this tangled web of conflicts could create incentives that harm borrowers and push homeowners unduly into foreclosure." SAC ¶ 34. Quoting the regulators, Neagle alleges the servicing industry "presents the extraordinary circumstance where there is effectively no customer to select a vendor for ancillary services" and "Ocwen's use of related companies to provide such services raises concerns about whether such transactions are priced fairly and conducted at arms-length." SAC ¶ 37.

At some point, Ocwen began serving Neagle's loan. "As a loan servicer, Ocwen's interactions with a borrower are governed by a mortgage contract." SAC ¶ 39. These contracts consist of the note and deed of trust and, at least with loans serviced by Ocwen, are generally identical as they follow the Fannie Mae template.

Neagle's deed of trust provides that in the event of a default, the lender will "pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property." Deed of Trust ¶ 9; ECF No. 57-1.[3] "Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower[.]" Deed of Trust ¶ 9. Neagle alleges that nothing in the deed of trust discloses "that the loan servicer or lender will engage in self-dealing or will mark-up the actual cost of those third party services to make a profit from the borrower's delinquency." SAC ¶ 42. This undisclosed mark-up is the focus of Neagle's claims:

> Pursuant to the conspiracy, Ocwen directs Altisource to order and coordinate default-related services, and Altisource places orders for such services with third-party vendors. The third-party vendors charge Altisource for the performance of the default related services, who then marks up the price, in numerous instances by 100% or more, and passes it along to Ocwen. Thereafter, Ocwen willfully

---

[3] The parties agree the Court may take judicial notice of the deed of trust.

5 – OPINION AND ORDER

accepts the inflated charge from Altisource, and bills the marked-up fees and costs to the borrower, increasing the balance owed.

SAC ¶ 45.

The inflated fees drive borrowers further into default. "In the present case, Plaintiff had incurred well over $14,000.00 in debt as a result of artificially inflated fees and costs." SAC ¶ 70. At some point, Neagle defaulted on his loan. In April 2012, OneWest Bank FSB filed a foreclosure action against Neagle. SAC ¶ 80. On June 13, 2013, Ocwen purchased the mortgage servicing rights to Neagle's loan as part of a deal to purchase servicing rights on $78 billion in unpaid principal loans. SAC ¶ 81. In October 2013, OneWest Bank FSB assigned the beneficial interest in Neagle's deed of trust to Ocwen, who moved to substitute itself into the foreclosure action. On March 3, 2016, Ocwen assigned its rights to MTQLQ. SAC ¶ 94.[4]

## STANDARDS

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter that "state[s] a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the factual allegations allow the court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The factual allegations must present more than "the mere possibility of misconduct." *Id.* at 678.

---

[4] Neagle includes a history of the foreclosure proceedings, with multiple reinstatements of the action followed by later orders vacating the earlier orders. Neagle alleges MTQLQ intentionally violated the automatic stay after Neagle filed for bankruptcy and then instructed the sheriff to sell Neagle's property after the foreclosure was dismissed. SAC ¶¶ 87-97. But those actions are not part of the alleged conspiracy, and the parties agree that Neagle still owns the property. At this stage, these allegations are not particularly relevant to Nagle's claims alleging defendants conspired to violate antitrust and RICO laws by inflating the fees charged to Nagle for default related services. As discussed below, these allegations are only relevant to Neagle's financial elder abuse claim.

6 – OPINION AND ORDER

While considering a motion to dismiss, the court must accept all allegations of material fact as true and construe those facts in the light most favorable to the non-movant. *Burget v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000). But the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. If the complaint is dismissed, leave to amend should be granted unless "the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

## DISCUSSION

Neagle alleges the conspiracy to pass inflated fees to borrowers violated the Sherman Act, RICO, and constitutes Financial Elder Abuse under Oregon law in violation of ORS § 124.100. As discussed below, Neagle fails to state a valid claim for any of his five claims. Ocwen and MTGLQ also argue dismissal is appropriate because Neagle failed to comply with the notice and cure provision of his deed of trust before filing this action. I agree and begin with that argument.

### 1.  NOTICE AND CURE PROVISION

Neagle's deed of trust states, "The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender." ¶ 13. Ocwen and MTGLQ are assigns of the lender. *See* SAC ¶¶ 78, 79, 82, 94 (alleging the original lender assigned the deed to OneWest Bank, FSB, who assigned the deed to Ocwen, who assigned the deed to MTGLQ). Section 20 of Neagle's deed of trust provides:

> Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party

(with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.

Neagle did not allege that he provided Ocwen or MTGLQ with notice and opportunity to cure but argues the provision does not apply because: (1) neither Ocwen nor MTQLQ is the "Lender;" (2) his claims are statutory, not contractual; and (3) notice here would be futile.

The Ninth Circuit considered, and rejected, the same arguments Neagle raises when affirming the dismissal, on notice and cure grounds, of a borrower's Fair Debt Collections Practices Act (FDCPA) claim against a loan servicer (also Ocwen).[5] *Giotta v. Ocwen Loan Serv., LLC*, 706 Fed. Appx. 421, 422-23 (2017) (unpublished). Though I am not bound by the unpublished *Giotta* opinion, I am not prevented from being persuaded by its logic. *Giotta* is directly on point and its reasoning is as sound as it is concise.

The borrowers there challenged the district court's dismissal of their FDCPA claim for failing to provide their loan servicer with notice and the opportunity to cure. Although the district court in *Giotta* relied on a written loan modification, the Ninth Circuit looked to the deed of trust. The notice provision there is identical to the notice provision here. In its brief discussion that applies equally well here, the Ninth Circuit explained:

> 1. The Notice Provision's text covers this action. The Notice Provision clearly applies to: (1) "any judicial action . . . that arises from the other party's actions pursuant to this Security Instrument;" or (2) "any judicial action . . . that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument." The Giottas were in default on their mortgage. Therefore, the Deed of Trust authorized property inspections and valuations to protect the Lender's interest in the property and to pass the fees for those services on to the borrower: "Lender may charge Borrower fees for services performed in

---

[5] Although *Giotta* did not address whether notice there would be futile, Neagle's futility argument is, itself, futile. Neagle alleges defendants caused his debt to increase by over $14,000. SAC ¶ 70. Although Ocwen no longer services Neagle's loan, it could have decided to simply cut a check for that amount directly to Neagle. Alternatively, MTGLQ may have concluded reducing the amount of Neagle's debt is appropriate. Guessing what Ocwen or MTGLQ would have done had Neagle provided notice is purely speculative.

connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees." In this case, the Giottas allege that Ocwen violated the FDCPA when it billed the Giottas for those fees without disclosing the profit structure of the third-party entity that conducted the services. Accordingly, the instant suit is a "judicial action . . . that *arises from* the other party's actions *pursuant to* this Security Instrument."

2. The Notice Provision requires notice to Ocwen. Per its text, the Notice Provision applies only to the "Lender." However, the Deed of Trust explicitly provides that "[t]he covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successor and assigns of Lender." Further, it specifically notified the Giottas that the note may be sold. Although Ocwen is not the "Lender" as defined in the Deed of Trust, it is an assign. Per the record, OneWestBank assigned the servicing rights on the Giottas' mortgage to Ocwen . . . . Providing notice before filing an action is a benefit (as opposed to a binding covenant or agreement), because it gives the Lender prior notice and an opportunity to take corrective action before litigation is formally commenced. Therefore, as an assign of the Lender, the Notice Provision is a "benefit" of the "covenants and agreements" in the Deed of Trust, inuring to Ocwen.

706 Fed. Appx. at 422 (all but final alteration in original).

The reasoning in *Giotta* is persuasive. Neagle alleges that Ocwen and MTGLQ were (at least) assigns of the Lender. *See* SAC ¶¶ 78, 79, 82, 94. Neagle's claims arise from Ocwen and MTGLQ's actions pursuant to the deed of trust; i.e., servicing the loan and charging Neagle "fees for services performed in connection with [Neagle's] default . . . including property inspection and valuation fees." Deed of Trust ¶ 14.

Neagle argues that because his claims arise from statute and not contract, the notice provision does not apply. *Giotta* considered, and rejected, that argument. 706 Fed. Appx. at 422-23 (concluding notice provision did not contravene the purpose of the FDCPA and "thus does not impermissibly abrogate" the statute). Although Neagle does not bring a FDCPA claim, the notice provision does not abrogate any of the claims he does bring.

9 – OPINION AND ORDER

The purpose of the Sherman Act is "to protect trade and commerce against unlawful restraints and monopolies." *Miranda v. Selig*, 860 F.3d 1237, 1240 (9th Cir. 2017) (quoting Sherman Act, ch. 647, 26 Stat. 209 (1890)). RICO's purpose is to prohibit racketeering activity. *Reves v. Ernst & Young*, 507 U.S. 170, 181-82 (1993). ORS 124.110 seeks to prevent financial abuse of a vulnerable person via a wrongful taking of money or property. *Schmidt v. Noonkester*, 287 Or. App. 48, 50 n.1 (2017). As in *Giotta*, "the Notice Provision does not contravene the statute[s'] purposes and, thus does not impermissibly abrogate the [statutes]." 706 Fed. Appx. At 422-23; *see also Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1170 (9th Cir. 2006) (noting party may generally waive statutory protection if waiver does not "contravene[] the statutory policy.") (quoting *New York v. Hill*, 528 U.S. 110, 116 (2000)).

As Neagle does not allege he provided Ocwen or MTGLQ with notice and the opportunity to cure the alleged violations, his claims against those defendants are dismissed. Because Altisource does not argue the notice provision applies to it, and because I assume Neagle could allege notice in an amended complaint, I turn to the merits of Neagle's claims.

## 2. ANTITRUST CLAIMS

Neagle brings antitrust claims under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.[6] Section 1 of the Sherman Act restricts unreasonable restraints on trade perpetrated by distinct entities acting in concert, whether via, "contract, combination . . . or conspiracy." *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) (quoting 15 U.S.C. § 1).

> To successfully bring a claim under section 1 of the Sherman Act, a plaintiff must prove three elements: (1) an agreement, conspiracy, or combination among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to

---

[6] Neagle also seeks treble damages and an injunction under the Clayton Act, 15 U.S.C. §§ 15, 26.

competition, beyond the impact on the claimant, within a field of commerce in
which the claimant is engaged (i.e., "antitrust injury").

*McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988) (internal citations omitted).

Section 2 of the Sherman Act functions as a restraint against the tendency in capitalistic
economies for single firms to seek and maintain monopoly power over a specific market. *See
Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).
Section 2 prohibits monopolies as well as attempts or conspiracies to form monopolies. *Image
Tech. Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997); 15 U.S.C. § 2.
Firms with monopoly power can set prices far above where the rational forces of supply and
demand in a competitive marketplace would have them, to the detriment of both consumers and
the economy as a whole. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir.
1995).

The enforcement mechanisms of section 2 of the Sherman Act restricts the ability of
firms to acquire monopoly power via illegal, anticompetitive actions, but are not meant to
prevent a firm from acquiring an increased share of a specific market via legitimate business
practices. *See Verizon Commc'ns Inc.*, 540 U.S. at 407. To state a claim under section 2, Neagle
must allege the defendants "(1) possessed monopoly power in the relevant market, (2) willfully
acquired or maintained that power through exclusionary conduct and (3) caused antitrust injury."
*MetroNet Services Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004). "Monopoly
power" under section 2 is a higher standard than that of "market power" required under section
1. *Image Tech. Services, Inc.* 125 F.3d at 1206.

While the specific elements required under section 1 and section 2 differ, those
differences are immaterial when, as here, Neagle's antitrust claims fail on a fundamental level.

11 – OPINION AND ORDER

Under either section, Neagle "must allege both that a 'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). The relevant market consists of a product market that "must encompass the product at issue as well as all economic substitutes for the product." *Id.* at 1045. Dismissal is appropriate "if the complaint's 'relevant market' definition is facially unsustainable." *Id.*

Neagle alleges Ocwen operates in the "nonbank subprime mortgage loan servicing" market. Reply, 34; ECF No. 63. Neagle's first problem regarding the alleged relevant market is that nowhere in the complaint does he allege his mortgage is a subprime mortgage. More significantly, Neagle fails to allege facts demonstrating the "nonbank subprime mortgage loan servicing market" actually exists for antitrust purposes. While "nonbank subprime mortgage loan servicing" is certainly a product, Neagle fails to allege why obvious "economic substitutes for the product" are not included in the relevant market. Neagle alleges that banks also service mortgages. SAC ¶ 21. And while subprime mortgages must be serviced, so must prime mortgages. Both bank and nonbank prime servicers are obvious potential competitors to nonbank subprime servicers.

The complaint tacitly acknowledges this potential crossover competition. Neagle specifically alleges that Ocwen also services prime, or "conventional" mortgages. SAC ¶ 28. As of the end of 2013, prime mortgages, along with "government insured" mortgages made up the majority of Ocwen's servicing portfolio. SAC ¶ 28. "For antitrust purposes, defining the product market involves identification of the field of competition: the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989).

12 – OPINION AND ORDER

Attempting to justify the proposed submarket, Neagle alleges "The market for servicing subprime mortgage loans is a market in which Ocwen specializes due to the high cost and inability of banks or prime-servicers to meet Ocwen's level of cost reduction." SAC ¶ 105. But "the scope of the relevant market is not governed by the presence of a price differential between competing products." *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 512 F.2d 1264, 1274 (9th Cir. 1975) (noting Supreme Court concluded the flexible wrapping market included cellophane, glassine, and grease-proof papers despite the fact that cellophane was two or three times more expensive than the others). Although Neagle alleges nonbank subprime mortgage loan servicers collect payments, administer escrow accounts, collect insurance claims, and manage loans in default and foreclosure, SAC ¶ 19, he omits obvious competitors from his proposed submarket. It seems clear those competitors, who currently compete with Ocwen in the prime market, would perform those same tasks for the right price. Neagle's proposed nonbank subprime mortgage loan servicing market is "facially unsustainable." *Newcal Indus., Inc.*, 513 F.3d at 1045.

Altisource's proposed market fares no better. Neagle alleges Altisource's relevant market is the third-party default-related services market. SAC ¶ 106. Neagle expends little effort demonstrating that the default-related services market and the non-default related mortgage services market are in fact separate relevant markets. But even looking beyond that deficiency, Neagle must also allege "that the defendant has power within that market." *Newcal Indus., Inc.*, 513 F.3d at 1044. Regarding Altisource's market power, Neagle alleges:

> Altisource generated over 80% of all of its revenue from Ocwen. Altisource's business focuses on providing third-party services for defaulted borrowers. As such, Altisource was able to exploit Ocwen's market share of over 50% of all subprime loans in the nation so that Altisource could rapidly expand its volume in the default related services market, more than tripling its revenue by 2014,

13 – OPINION AND ORDER

completely insulating Altisource from competition in its market and resulting in a
substantial foreclosure of competitors.

SAC ¶ 106.

But alleging Alitsource grew rapidly and received 80% of its revenue from Ocwen (who

had a market share of over 50% in its own, separate and distinct relevant market), does little to

establish Altisource had market power in the default-related services market. As noted by

Altisource, "A roadside farm may advertise 'locally-grown blueberries,' and derive 100% of its

revenue from the sale of such blueberries, but these facts are irrelevant to whether 'locally-grown

blueberries' constitutes a distinct antitrust product market, and offers no basis to conclude that

the farm stand exercises market power within that market." Reply, 5-6 n.5. Neagle's response to

Altisource's market power argument is puzzling:

> The SAC alleges market power as well. [SAC] ¶ 6. Altisource's market share can
> be aggregated with Ocwen's market share due to the SAC's allegation of a
> conspiracy between the two parties. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51
> F.3d 1421, 1437 (9th Cir. 1995) ("The aggregation of market shares *of rivals* is
> justified *if the rivals are alleged to have conspired to monopolize*." The combined
> market share of Ocwen and Altisource is well above 50% of all defaulted
> borrowers serviced by nonbank mortgage loan servicers, and is sufficient "as a
> matter of law to support a finding of market power." *See Rebel*, 51 F.3d at 1438
> (ARCO's market share of 44 percent is sufficient as a matter of law to support a
> finding of market power.").

Resp. 10-11; ECF No. 64 (emphasis added) (footnote omitted).

*Rebel* dealt with an alleged conspiracy to fix prices at competing Las Vegas gas stations.

51 F.3d at 1437. If Altisource and Ocwen were rivals, it would certainly apply. But although

Altisource and Ocwen are alleged conspirators, they are not competitors. They are two

independent companies, SAC ¶ 15, operating in two different distinct markets. Considering the

SAC does not make even a cursory description of the alleged default-related services market,

Neagle fails to allege Altisource has market power within it.

14 – OPINION AND ORDER

As Neagle fails to allege a relevant market for Ocwen and fails to allege that Altisource has market power in the default-related services market, he fails to state a claim under section 1 or 2 of the Sherman Act. *Newcal Indus., Inc.*, 513 F.3d at 1045. Because additional deficiencies in Neagle's antitrust claims demonstrate leave to amend would be futile, I briefly touch on some of the other deficiencies in the SAC.

A rather large hurdle for Neagle is that, at least as to the impact on the nonbank subprime loan servicing market, the alleged conspiracy simply does not make sense. Neagle alleges:

> Ocwen and Altisource entered into an agreement to circumvent the borrower protections in a mortgage contract in order to continue profiting in a market that would otherwise drive Ocwen out. As a nonbank loan servicer, Ocwen's main source of profit comes from fees and costs generated by third-party services, not the interest on the loan.

SAC § 43.

The first sentence is largely conclusive, essentially just adding the specific defendant names into language found in any antitrust treatise outlining a general antitrust conspiracy. At first glance, it certainly sounds impressive, especially as it alleges that absent the conspiracy, Ocwen would be driven out of the relevant market.

The second sentence details how Ocwen makes a profit: "from fees and costs generated by third-party services." But the reader then remembers that Ocwen does not mark up the alleged overcharge Altisource bills it for third party services. As Ocwen merely passes along the alleged overcharge to the borrower, the very best it can ever hope for is to be reimbursed at some later point for the overcharge it earlier paid Altisource. In other words, Ocwen merely hopes to eventually break even from this conspiracy. There is no profit "from fees and costs generated by third-party services" for Ocwen in the alleged conspiracy. Every penny of profit from this alleged conspiracy flows to Altisource, not Ocwen. Therefore, the alleged conspiracy does not

15 – OPINION AND ORDER

allow Ocwen to "continue profiting in [the non-bank subprime mortgage servicing] market that would otherwise drive Ocwen out."[7]

Additionally, Neagle fails to allege Ocwen and Altisource reached an agreement or conspired to restrain trade.[8] Neagle points to the fact that the founder and Chairman of Ocwen is also the Chairman of Altisource and "[o]ther key executives shared positions with Altisource as well," SAC ¶ 31; the Consent Order Ocwen agreed to with New York regulators; and a Services Agreement between Ocwen and Altisource. None, however, actually point to an agreement to unlawfully restrain trade.

Much like any contract where one company agrees to provide certain services or goods for a set time to another company, the Services Agreement sets out the price Ocwen will pay Altisource for the services Altisource provides. Neagle notes the agreement designates the services "Fixed Price Project" and argues that this is direct evidence of price fixing. But the Services Agreement is a standard contract, not evidence of an agreement to illegally restrain trade. "Literalness is overly simplistic and often overbroad. When two partners set the price of their goods or services they are literally 'price fixing,' but they are not *per se* in violation of the Sherman Act." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9 (1979). While it clearly sets a "fixed price" for certain services, the Services Agreement also states, "The parties intend that any such fees reflect the market rate for comparable services." ¶ 4(a).

Additionally, the Services Agreement is not an unlawful exclusive dealing agreement. As shown above, Neagle provides no allegations concerning Altisource's share of the third-party

---

[7] While the alleged conspiracy would benefit Altisource in the "third party default related services" market, as described above, Neagle fails to provide any allegations as to Altisource's market power in that market.

[8] Neagle does not make even a half-hearted attempt at connecting MTGLQ to this conspiracy. As described below, the only specific factual allegations as to MTGLQ are that it now owns the mortgage and it filed a court document asking the Sheriff to conduct a foreclosure sale of Neagle's home.

default-related services market. Absent that, Neagle cannot demonstrate the Services Agreement forecloses competition in a substantial share of that market. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 286 (3rd Cir. 2012). Perhaps recognizing his inability to allege Altisource's market share and power in the third-party default-related services market, Neagle points to the existence of a "Services Letter," which Neagle apparently has never seen but which he argues "likely contains terms concerning market share and volume." Resp. 30; ECF No. 63. Perhaps that letter exists somewhere, and perhaps it contains information that would be helpful to Neagle now. But it is not before the court at this time, and Neagle fails to demonstrate the agreement would foreclose substantial competition in the market for third-party default-related services market.

The Consent Order likewise fails to help Neagle. That document merely shows New York regulators were concerned about conflicts of interest between Ocwen and other public companies who had the same Chairman. The Consent Order states the Chairman "participated in the approval of a number of transactions between the two companies or from which Altisource received some benefit, including the renewal of Ocwen's forced placed insurance program in early 2014." ECF No. 66-2, ¶ 21. Additionally, "In certain circumstances, [an Altisource subsidiary] has charged more for its services to Ocwen than to other customers—charges which are then passed on to borrowers and investors." ECF No. 66-2, ¶ 22. Hubzu, the subsidiary mentioned in the Consent Order, performed online auctions for Ocwen (via Altisource). The SAC does not mention Hubzu and Neagle does not allege that his home was the subject of an online auction. The Consent Order is silent as to property preservation fees, BPOs, title examination or search fees, appraisals, property inspections, or escrow account related fees. In

other words, the Consent Order is silent as to any conflict of interest regarding any services

Neagle alleges were charged here.[9]

"[T]o allege an agreement between antitrust co-conspirators, the complaint must allege

facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a

defendant seeking to respond to allegations of a conspiracy an idea of where to begin." *Kendall*

*v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008). The Services Agreement to "fix prices"

is the closest Neagle comes to alleging an actual agreement. But that standard business contract

does not unreasonably restrain trade. *See NCAA v. Bd. of Regents*, 468 U.S. 85, 98 (1984) (noting

that "every contract is a restraint of trade, and as we have repeatedly recognized, the Sherman

Act was intended to prohibit only unreasonable restraints of trade."). This is a far cry from

conspiracy cases where the plaintiffs allege not only the opportunity to collude (as Neagle does),

but also support those allegations with specific factual allegations of multiple meetings between

senior executives of different companies who entered express agreements to achieve a common

goal in violation of antitrust laws (as Neagle does not). *See In re Lithium Ion Batteries Antitrust*

*Litig.*, 2014 WL 309192, at *3 (N.D. Cal. 2014) ("Plaintiffs allege particular meetings, particular

attendees, particular times and places, and the content of particular conversations" and

documents memorializing the meetings); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d

1103, 1118-19 (N.D. Cal. 2012) (complaint "details the actors, effect, victims, location and

timing of the six bilateral agreements [not to poach employees from one another]," quotes one

CEO discussing the alleged conspiracy with another CEO, and noted a DOJ investigation found

the agreements "per se unlawful" and defendants agreed the DOJ "stated a federal antitrust

---

[9] As discussed below, Neagle's allegation regarding lender-placed insurance fails to support his claims as that claim was released as part of the class settlement.

claim."). Other than the benign Services Agreement, Neagle does not state who entered into an

agreement (other than the companies generally), or where or when defendants entered into an

agreement to unlawfully restrain trade.

Additionally, Neagels' five specific alleged violations—of a horizontal agreement, an

unreasonable resale price maintenance agreement, a tying arrangement, an unreasonable

exclusive dealing arrangement, and discriminatory pricing—fare no better. Some of Neagle's

responsive arguments are bizarre, turning antitrust theory on its head. Perhaps the best example is

Neagle's argument regarding how predatory pricing supports his discriminatory pricing theory:

> Loan servicers like Ocwen compete by reducing their costs, resulting in a greater
> profit margin for the loan servicer. To drive competitors out of the market, Ocwen
> conspires with Altisource to inflate third-party services sold to Ocwen under its
> Services Agreement, something competing loan servicers cannot do. Therefore,
> Ocwen suffers a loss that is identical to the loss suffered by a monopolist that sells
> its products below its cost. *See Solyndra*, 62 F. Supp. 3d. at 1040 ("In a typical
> predatory-pricing scheme, the predator reduces the sale price of its product (its
> output) to below cost, hoping to drive competitors out of business."). Ocwen just
> willingly pays higher prices instead.
>
> While the common below-cost predatory pricing scheme forecloses competition
> by selling services at a price that competitors cannot sustain, Ocwen and
> Altisource's inflated predatory pricing scheme provides a profit margin that
> competitors cannot obtain. *See* ECF No. 47 ¶ 102(5). The effect is identical: the
> exclusion of competitors from the market.
>
> As long as Plaintiff has alleged predatory pricing that can result in the exclusion
> of competitors, Plaintiff's allegations are "sufficient to avoid dismissal" under
> section one of the Sherman Act.

Resp. 32-33; ECF No. 63.

The "output" here are default-related services. Altisource, not Ocwen, benefits from the

inflated pricing. Unlike a true predatory pricing scheme, which trades short term losses for less

competition (and greater profits) later, Altisource's own short term profits will not drive its

competitors out of business. Altisource merely rakes in more profits than its competitors in the

19 – OPINION AND ORDER

default-related services market. After all, a conspiracy "to charge higher than competitive prices" would tend to benefit Altisource's competitors in the default-related services market. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 582-83 (1986). And even assuming Ocwen is eventually reimbursed for the higher prices it willingly pays Altisource, the best it can hope for is to break even. The scheme to willfully overpay makes Ocwen less competitive in its market, where loan servicers "compete by reducing their costs, resulting in a greater profit margin for the loan servicer." Ocwen's competitors in the nonbank subprime mortgage loan servicing market are not harmed by the inflated profits Altisource makes in the default-related services market. In addition to not making economic sense, Neagle's "inflated predatory pricing scheme" fails to demonstrate any competitors would be excluded from either relevant market.

Neagle's attempt at salvaging his tying theory also fails.

A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market. To accomplish this objective, the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product). Tying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product.

The Supreme Court has developed a unique per se rule for illegal tying arrangements. For a tying claim to suffer per se condemnation, a plaintiff must prove: (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market.

*Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 912-13 (9th Cir. 2008) (internal citations, quotations, and footnotes omitted).

Neagle argues Ocwen used its market power in the nonbank subprime mortgage serving market to force Neagle to purchase the inflated third-party default-related services. There are

20 – OPINION AND ORDER

multiple fatal flaws with this theory. First, in this alleged scheme, the buyer of the tying product (the owner of the mortgage) never buys the tied product (third-party default-related services). Neagle therefore can never establish that Ocwen used its market power in the loan servicing market to coerce the owner of the mortgage to purchase third-party default-related services.

Second, Ocwen does not sell third-party default-related services, it buys them (allegedly at an inflated price) from Altisource and then passes those charges on to the borrower. Tying arrangements are prohibited because the seller of the tying product "can leverage this market power through tying arrangements to exclude other sellers of the tied product." *Cascade Health Solutions*, 515 F.3d at 912. The seller of the tying product needs an unlawful advantage (market power in the tying market) to protect its tied product from competition. Here, Altisource, the seller of the tied product, does not even participate in the tying market and has no leverage to force the buyer of the tying product to also purchase third-party default-related services.

Third, Neagle cannot prove a tying arrangement where he is not a purchaser in either the tying or the tied market. Because Neagle did not purchase either product, he could not have influenced competition in either market. Neagle never wanted to purchase any default-related services. To the extent Neagle argues he may bring a tying claim as an "indirect purchaser" of default-related services, his argument is barred by the zero foreclosure doctrine. "*Zero foreclosure exists where the tied product is completely* unwanted by the buyer." *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1089 (9th Cir. 2009). "[W]hen a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed." *Id.* (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984)).

21 – OPINION AND ORDER

Moving past the flawed tying theory, Neagle fails to allege a horizontal conspiracy to inflate "charges incurred by horizontally situated and independent third-party default related services providers enlisted by Altisource," SAC ¶ 102(1) because he fails to allege the third-party providers conspired to fix the prices charged to Altisource. Because there is no allegation the third-party service providers agreed on fix prices, Neagle fails to establish the "rim" of the conspiracy. *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015) ("the rim of the wheel, which consists of horizontal agreements among the spokes" is an element of a hub-and-spoke conspiracy). Altisource's mere act of charging Ocwen more than it paid the third-party service providers does not support Neagle's claim because that mark-up "suggests a rational business decision, not a conspiracy." Kendall, 518 F.3d at 1049. After all, a middleman who does not mark up the price it charges from the price it paid will not stay in business for long.

Neagle similarly fails to demonstrate defendants entered into "an illegal resale price maintenance agreement which requires servicers to charge borrowers for fees and default related services in an amount that is no less than the inflated price required by Alitsource." SAC ¶ 102(2). While the Services Agreement provides the fixed price Ocwen will pay Altisource for certain third-party services, Neagle fails to point to any agreement between the two concerning a price Ocwen must charge the borrower. That Ocwen does not charge the borrower less than what it paid to Altisource is not evidence of an "illegal resale price maintenance agreement."

Neagle's attempted monopolization claim suffers from many of the same fatal deficiencies noted above. Additionally, consumers[10] such as Neagle "lack standing to bring a

---

[10] Neagle is, at best, an indirect consumer of third-party default-related services. He is not a consumer, even indirectly, of nonbank subprime mortgage loan services.

claim for attempted monopolization." *Simpson v. US West Communications, Inc.*, 957 F. Supp. 201, 205 (D. Or. 1997). The competitor, not the consumer, is the party with antitrust standing to bring a claim of attempted monopolization. *In re Air Passenger Reservation Sys.*, 727 F. Supp. 564, 570 (C.D. Cal. 1989) (citing P. Areeda & H. Hovencamp, *Antitrust Law* ¶¶ 340.2b & 337.1 (1988 Supplement)). After all, while supracompetitive rates are a result of a monopoly, higher rates absent a monopoly are invitations for new competitors to enter the market, not exclusionary acts. *Id*. Thus, higher prices paid by consumers in an attempted monopolization, as Neagle alleges here, are not injuries the antitrust laws were designed to prevent.

The fundamental defects in Neagle's pleadings, the tacit acknowledgment that absent a Services Letter that he has never seen he cannot allege Altisource's market share, and Neagle's bizarre arguments (including his "inflated predatory pricing" argument) convince the court that no amount of repleading will save Neagle's antitrust claims.

3. **RICO CLAIMS**

"To state a claim under § 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 557 (9th Cir. 2010) (quoting *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007).

The parties agree that because Neagle bases his RICO claims on mail and wire fraud, those claims must satisfy rule 9(b)s heightened pleading standards for claims sounding in fraud. To state a claim for wire or mail fraud, Neagle must allege: "(1) formation of a scheme or artifice to defraud; (2) use of the United States mails or wires, or causing such a use, in furtherance of the scheme; and (3) specific intent to deceive or defraud." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 557 (9th Cir. 2010). Nealge must state with particularity "the factual circumstances of the fraud itself." *Id.* (quoting *Odom*, 486 F.3d at 554.

23 – OPINION AND ORDER

What the SAC lacks in specific factual allegations, it makes up for in length. Throughout the 43-page SAC and nearly 100 pages of briefings in opposition to the motions to dismiss, Neagle repeatedly takes a lot of space to say remarkably little about how these defendants conspired to defraud him in the course of servicing his mortgage.

Neagle alleges few specific instances where Ocwen and closely affiliated companies conspired to inflate fees. Neagle points to the Consent Order between Ocwen and New York regulators, where those parties agreed:

> In certain circumstances, [Altisource subsidiary] Hubzu has charged more for its services to Ocwen than to other customers—charges which are then passed on to borrowers and investors. Moreover, Ocwen engages Altisource Portfolio subsidiary REALHome Services and Solutions, Inc. as its default real estate agency for short sales and investor-owned properties, even though this agency principally employs out-of-state agents who do not perform the onsite work that local agents perform, at the same cost to borrowers and investors.

Consent Order ¶ 22; ECF No. 66-2; SAC ¶50.

While that is a specific factual allegation, Neagle does not allege Hubzu provided, let alone charged Ocwen for, any services performed on Neagle's loan. Similarly, Neagle does not allege REALHome charged Ocwen for any services on his loan. Neither Hubzu nor REALHome are mentioned in the SAC, and Neagle does not allege any defendant conducted a short sale.

Neagle also points to a scheme to overcharge for lender-placed insurance. SAC ¶¶ 53-58. In this lone specific factual allegation of an inflated fee Ocwen actually charged him, Neagle alleges:

> Ocwen imposed a lender-placed insurance policy obtained from SWBC onto Plaintiff in July of 2014. The master policy number of the insurance policy was NP098022301. Consistent with the agreement to artificially inflate the charge of this policy, Altisource received inflated fees and costs that were ultimately charged to Plaintiff through Ocwen's agreement with SWBC, and SWBC's agreement with Altisource.

24 – OPINION AND ORDER

SAC ¶ 57.

This allegation appears to meet rule 9(b)'s requirement that Neagle must allege the who, what, where, and when concerning the alleged fraud. Neagle, however, released any claims regarding lender-placed insurance as part of the class action settlement in *Lee v. Ocwen Loan Servicing, LLC*, S.D. Fla. No. 0:14-cv-60649-JG.[11] Ocwen Req. Judicial Notice, Ex. C; ECF No. 57-3. The *Lee* settlement released all claims from borrowers charged by Ocwen under a lender-placed insurance policy from January 1, 2008 through January 23, 2015. *Lee*, 2015 WL 544813, at *3 (Sept. 14, 2015). Class members released any claims that could have been brought in the class action, or that relate or pertain in any way to Ocwen's issuance of lender-placed insurance policies during the settlement class period. Ocwen Req. Judicial Notice, Ex. C, ¶ 2(a), (b). Among other claims, class members released any claims of "kickbacks" or "tying" arrangements between Ocwen and lender-placed insurance. ¶ 2(b). The lender-placed insurance allegation therefore does not actually support Neagle's claims.

Neagle's generalized allegations fall well short of establishing the who, what, when and where necessary to meet the heightened pleading requirements for a fraud claim. Conspicuously absent is any allegation of Ocwen charging Neagle a specific, inflated fee on a specific date:

> 66. Another fee or cost that is significantly marked-up includes title examination and/or title search fees. Title related fees assessed by Ocwen and charged to borrowers and Plaintiff are significantly marked-up, at times exceeding $800. Moreover, fees and costs incurred by hiring "property preservation" vendors are commonly marked up. Plaintiff was excessively charged for "property preservation" fees by Ocwen and subsequent loan servicers of Plaintiff's mortgage loan. Plaintiff was also charged for escrow fees related to property taxes and for the balance of tax payments forwarded by Ocwen into escrow, despite having made payments for property taxes himself.

---

[11] Negale does not dispute that the final judgment in *Lee* is subject to judicial notice.

67. The above described costs and fees are not exclusive. Ocwen and subsequent servicers participating with Ocwen and the conspiracy between Ocwen and Altisource charged marked up fees related to several other types of third party services and mortgage insurance for lender placed insurance.

\* \* \* \*

84. During the relevant period, Ocwen assessed inflated fees and costs to Plaintiff's mortgage balance which included, *inter alia*, (1) property preservation fees, which were repeatedly and excessively charged to Plaintiff's account, sometimes with multiple unexplained "property preservation" charges during one monthly period; (2) broker price opinion fees, which despite costing approximately \$30,[12] were charged to Plaintiff for anywhere from \$80 to \$100; (3) title examination and title search fees; (4) lender-placed insurance costs and fees; (5) appraisals; (6) property inspections; and (7) escrow account related fees, among other things.

\* \* \* \*

86. Ocwen alone maintains a complete accounting of all fees assessed and paid, and the details of each and every fee assessed and paid cannot be alleged with complete precision without access to Ocwen's records. Plaintiff has attempted to obtain these records from Ocwen and its successors, but has routinely been denied access to this information.

SAC.

Neagle need not allege with complete precision "the details of each and every fee assessed and paid," but he needs to allege at least one to state a claim for mail or wire fraud. Neagle's RICO claims do not rely only on the inflated charge, but on the fact that defendants used the mails and wires to further their scheme to defraud to him. *Sanford*, 625 F.3d at 557. In a general manner, Neagle alleges the defendants used mailings or calls to perpetuate the scheme:

134. Furthermore, to lull homeowners into a sense of trust and dissuade them from challenging Ocwen's unlawful charges, Ocwen concealed the scheme from borrowers by telling them, in statements and other documents, that such fees are in accordance with the terms of their mortgage.

---

[12] Earlier in the SAC, Neagle alleges that Ocwen paid agents \$45 to \$50 for a BPO 10 years earlier, in 2004. SAC ¶ 65.

135. The mortgage invoices, loan statements, or proofs of claims provided to borrowers disguised the fact that the default-related service fees assessed on homeowners' accounts were marked-up. By disguising the true nature of amounts purportedly owed in communications to borrowers, the Ocwen Enterprise made false statements using the internet, telephone, facsimile, United States mail, and other interstate commercial carriers.

SAC.

But other than the lender-placed insurance allegation (which Neagle cannot rely on), Neagle includes no specifics at all as to when any defendant used the mails or wires to defraud him. Neagle does not, for example, allege he received a mortgage statement on a specific date, sent from a specific defendant, that included a specific fraudulent charge. "[T]o avoid dismissal for inadequacy under Rule 9(b), [the] complaint would need to state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Sanford*, 625 F.3d. at 558. Neagle's response concedes he cannot plead his fraud claims with specificity: "The above-described allegations concern the 'time' and 'place' of the fraudulent activities because Plaintiff alleges the period of time that Ocwen serviced Plaintiff's loan, and the 'nature' of the fraudulent activities are alleged by the category of fees that were charged to Plaintiff's account."[13] Resp. 42-43; ECF No. 63. But merely alleging that Ocwen serviced his loan for 2.5 years and the alleged fraud happened at some point during that time period will not do. Pleading the specifics of an alleged scheme, without alleging the specific times and places of the "factual circumstances of the fraud itself[,]" fails to rise to rule 9(b)'s heightened pleading standards. *Sanford*, 625 F.3d at 557-58 (where it is reasonable that plaintiff would have personal knowledge of the relevant facts, plaintiff must plead specific time and place in addition to outlining the general scheme).

---

[13] Ocwen points out that during the mandatory conferral process before filing motions, Neagle's attorney conceded he could not plead additional specific factual allegations. ECF No. 68, 40.

Neagle argues *Weiner v. Ocwen Fin. Corp.*, 2015 WL 4599427 (E.D. Cal.) "is nearly identical to the allegations in this case." Resp. 43. For two reasons, *Weiner*, a case involving essentially the same allegations as to Ocwen's alleged scheme to defraud borrowers, does not help Neagle. First, Weiner brought his claims as part of a class action. Second, Weiner alleged two specific BPO fees and one title search, and for each instance, Weiner included the specific amount Ocwen billed him, the amount he should have been billed, and the exact dates Ocwen assessed the fees on his mortgage account. *Id.* at *7-8. As noted, Neagle does not include any specific allegations. As Neagle does not specifically allege a single false representation any defendant sent him using the mails or wires, his RICO claims are dismissed. As Neagle fails to state a RICO violation, his RICO conspiracy claim fails. *Sanford*, 625 F.3d at 559.

4. **FINANCIAL ELDER ABUSE**

"A statutory claim for financial abuse has four elements: there must be (1) a taking or appropriation (2) of money or property (3) that belongs to an elderly or incapacitated person, and (4) the taking must be wrongful." *Church v. Woods*, 190 Or. App. 112, 117 (2003). "Conduct generally is wrongful if it is carried out in pursuit of an improper motive or by improper means . . . . Improper means, for example, include violence, threats, intimidation, deceit, misrepresentation, bribery, unfounded litigation, defamation and disparaging falsehood." *Id.* at 118 (internal quotation marks omitted).

Neagle alleges the "Defendants wrongfully took and withheld the property of Plaintiff by charging unlawfully inflated fees, costs, mortgage insurance premiums, and escrow fees, among other things, and by foreclosing on plaintiff's mortgage and selling plaintiff's home, without good cause and in bad faith." SAC ¶ 151. As for the allegedly inflated fees, the fact that Ocwen added those to Neagle's debt does not qualify as a "taking" under the statute. "ORS chapter 124

28 – OPINION AND ORDER

does not define 'takes' or 'taking.' The ordinary meaning of 'take' is 'to transfer into one's own

keeping [or to] enter into or arrange for possession, ownership, or use of[.]'" *Id.* (quoting

*Webster's Third New Int'l Dictionary* 2330 (unabridged ed 1993) (alterations in original)).

Neagle does not allege he ever paid one of the disputed fees (that he fails to state with

specificity). Adding to the amount of Neagle's debt is not a taking or appropriation of Neagle's

money or property.

Neagle alleges that Ocwen initiated unfounded litigation, i.e., foreclosure proceedings.

Even assuming "unfounded litigation" satisfies the "wrongful element" of financial elder abuse,

Neagle must still meet the "taking" element. *Schmidt v. Noonkester*, 287 Or. App. 48, 54-55

(2017). In *Schmidt*, plaintiffs brought a baseless fraud claim against the elderly defendant. The

court concluded that "the alleged damages incurred by the defendant—the time, effort, stress,

and expense incurred in defending against plaintiffs' fraud claim—do not involve a transfer of

defendant's money or property into plaintiffs' 'own keeping'." *Id.* 287 Or. App. at 55.

Neagle alleges that on May 3, 2016, Ocwen assigned all rights to Neagle's property to

MTGLQ. SAC ¶ 94. At that time, the foreclosure proceedings were ongoing, and there had been

no sale of Neagle's property. Therefore, even assuming the foreclosure proceedings were

"unfounded litigation" and therefore "wrongful," Neagle fails to allege Ocwen conducted an

"unlawful taking" of his property.[14]

The only specific factual allegations as to MTGLQ in the 43-page complaint are: (1) on

May 3, 2016, Ocwen assigned its rights in Neagle's property to MTGLQ; (2) "MTGLQ

simultaneously filed a Praecipe for Writ of Execution, instructing the Linn County Sheriff to sell

---

[14] Other than the general allegations of a conspiracy between the defendants, there are no allegations that Altisource ever took, wrongfully or otherwise, any money or property of Neagle's.

29 – OPINION AND ORDER

Plaintiff's property at public auction;" and (3) the Sheriff "sold Plaintiff's home and property to MTLGQ on July 19, 2016." SAC ¶ 95. But these allegations do not demonstrate MTLGQ was aware of the conspiracy to inflate fees for third-party default-related services between Ocwen and Altisource.[15]

Throughout the SAC, the defendants are often mushed together, which Neagle apparently believes is sufficient because he labels this a "conspiracy." To take but one example:

> In this complaint, whenever reference is made to any act, deed, or conduct of any one of the above-mentioned defendants, committed in connection with the combination and conspiracy alleged herein, the allegation means the defendants collectively, or the defendant or defendants that are the subject of the relevant allegation collectively, and each defendant engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, coconspirators, or representatives, each of whom was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of defendants individually and collectively, and the combination and conspiracy itself.

SAC ¶ 17.

For the purpose of a motion to dismiss, the entire paragraph above says absolutely nothing. Unlike Altisource, which Neagle alleges is closely connected to Ocwen through the common Chairman and other senior executives, there are no allegations linking MTGLQ to Ocwen or Altisource. The only alleged connection between MTGLQ and either other defendant is, "On or about May 3, 2016, Ocwen filed an Assignment of Judgment purporting to assign all right[s,] title, and interest in Plaintiff's property, including the rights as judgment creditor for Plaintiff's property, to MTGLQ Investors, L.P." SAC ¶ 94. There is no allegation that MTGLP knew of the allegedly inflated fees, or even knew that Neagle challenged the fees.[16] Neagle

---

[15] The Court does not intend to imply that Neagle has, in fact, adequately pleaded a conspiracy between Ocwen and Altisource. I merely point out that the SAC is hopelessly deficient in connecting MTGLQ to the alleged conspiracy.

[16] As noted, Neagle did not allege he gave any defendant notice and opportunity to cure before filing this action.

30 – OPINION AND ORDER

alleges defaulting on his mortgage. SAC ¶ 3. Other than generally alleging that the three

defendants acted "collectively," there is no allegation that MTGLQ knew the foreclosure

proceedings were "wrongful."

Additionally, in his response, Neagle admits that even assuming the foreclosure

proceedings were "wrongful," there was no "taking" of Neagle's property:

> The order that reinstated the case in which MTGLQ filed its Praecipe for Writ of
> Execution was entered during a valid automatic bankruptcy stay. [SAC ¶ 92] A
> bankruptcy stay applies to "*any* act . . . to exercise control over property of the
> estate," 11 U.S.C.A. § 362(a)(3), including "the commencement . . . of a judicial,
> administrative, or other action." *Id*. (a)(1). Unless a party obtains relief from a
> bankruptcy court, "violations of the stay are void." *In re Schwartz*, 954 F.2d 569,
> 573 (9th Cir. 1992). Therefore, Ocwen's order reinstating the case in which
> MTGLQ filed its Praecipe for Writ of Execution was "void." *Id.* It logically
> follows that MTGLQ's filing were void, which is why the sale was rescinded.

Resp. 14; ECF No. 65.

Intentionally or not, Neagle leaves out the final logical step: a void foreclosure sale that is

quickly rescinded "do[es] not involve a transfer of [Neagle's] money or property into

[MTGLQ's] 'own keeping'." *Schmidt*, 287 Or. App. at 54-55. To be clear, Neagle does not

allege that after the void sale, MTGLQ moved into the property and changed the locks. Quite the

opposite, Neagle alleges that somehow the void Praecipe for Writ of Execution resulted in a sale

occurring by operation of law under ORS § 18.936, which provides that a judgment creditor like

Altisource "may instruct the sheriff to accept any bid that matches the amount of the judgment

creditor's bid." Especially when Neagle alleges the Praeipe for Writ of Execution was itself void,

a void sale under § 18.936(3) is not a "taking" under ORS 124.110.

## CONCLUSION

Naegle chose to frame this action challenging the reasonableness of servicing fees

charged under his mortgage contract as a conspiracy to violate antitrust and RICO laws. In

31 – OPINION AND ORDER

reading the complaint and Neagle's responses, one continually pictures Neagle attempting to force a square peg into a round hole. I do not mean to imply that I approve of the scheme alleged here. I merely say that Neagle does not state a claim for antitrust or RICO violations. Nor does Neagle state a claim for financial elder abuse. As Neagle did not comply with the notice and cure provision of his deed of trust, his claims are dismissed. Because it is clear leave to amend would be futile, Neagle's claims are dismissed with prejudice.

      IT IS SO ORDERED.

DATED this 1st day of March, 2019.

                     _____/s/ Michael J. McShane_____
                                  Michael McShane
                         United States District Judge

32 – OPINION AND ORDER